**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 9:13-cv-80796

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) ) |
| **WORTH GROUP INC., ANDREW WILSHIRE, and EUGENIA MILDNER,** | ) ) ) |
| **Defendants.** | ) ) |
| _____ | ) |

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF
AND PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

The U.S. Commodity Futures Trading Commission ("CFTC" or "Commission"), by its attorneys, alleges as follows:

**SUMMARY**

1.      From July 16, 2011 through the present (the "relevant period"), Worth Group Inc. ("Worth"), by and through its agents, officials, or persons acting within their employment, agency, or office with Worth, has offered to enter into, entered into, executed, and confirmed unlawful off-exchange precious metals transactions, and has defrauded its customers by misrepresenting the nature of its retail customer transactions.

2.      Worth purports to sell physical commodities, including gold, silver, platinum, and palladium, on a leveraged, margined, or financed basis ("retail commodity transactions" or "financed transactions"), as well as on a fully-paid basis ("fully-paid transactions") to retail customers located throughout the United States.  Worth is managed by its 100% owner, Andrew Wilshire ("Wilshire"), and its President, Eugenia Mildner ("Mildner").

1

3.      Following the enactment of Section 742 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act" or "Dodd Frank"), Public Law 111-203, 124 Stat. 1376 (2010), effective July 16, 2011, retail commodity transactions as defined above must be executed on a regulated commodities exchange pursuant to Section 4(a) of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. § 6(a) (Supp. IV 2011).

4.      Transactions that result in actual delivery of precious metals to customers within 28 days ("timely actual delivery") are excepted from this requirement (the "28-day exception"). To make actual delivery, the seller in a financed transaction must secure and deliver the contracted amount of physical metal for each customer within 28 days of its acceptance of the customer's order.

5.      Because Worth receives only a relatively small "down payment" when its customers make a financed metals purchase, and Worth generally has not had access to outside lines of credit, Worth has been forced to "self-finance" financed transactions to attempt to make physical delivery as required by the exception.  Self-financing the volume of financed business Worth transacts requires many tens of millions of dollars.

6.      In its efforts to meet the demands of self-financing for its financed transactions, Worth has cheated, defrauded, or deceived another category of its customers, who Worth has incorrectly perceived as falling outside of the CFTC's jurisdiction:  those who have made fully-paid purchases following the implementation of Dodd-Frank.

7.      During the relevant period, Worth has represented to fully-paid customers that it delivers precious metals purchased on a fully-paid basis within 28 days of purchase, making delivery either to the customer or to a depository for the customer's benefit.  In most instances, however, Worth has not purchased any physical metals for fully-paid customers unless the

customer has demanded personal delivery.  Instead, Worth has purchased financial metals derivatives in margin accounts owned by Worth that would purportedly "cover" customer transactions, but that did not involve any transfer or physical delivery of precious metals to either Worth or its retail customers.  Because Worth has been required to post only a fraction of the value of a customer metal purchase to open these derivatives positions, it has been able to use the remaining funds to purchase physical metals for financed retail commodity transaction customers.

8.     Despite using funds paid by fully-paid customers to purchase physical metal for financed customers, Worth still fails to make timely actual delivery to many of its financed customers, and thus violates the CEA by failing to conduct those transactions on a regulated exchange.

9.     Worth's failure to make timely actual delivery to its financed customers also constitutes fraud.  Although Worth leads customers to believe that they have purchased physical metals from Worth for delivery to a depository by a date certain, Worth's financed customers do not in fact receive metals on those terms, and as a result are unknowingly subjected to additional counterparty risk in the form of exposure to Worth's financial stability.

10.    The scale of Worth's retail precious metals activities is substantial.  During the period from July 18, 2011 to December 31, 2012, Worth's customers contributed over $73 million to Worth accounts and purchased precious metals valued by Worth at over $264 million through fully-paid or financed transactions.

11.    By virtue of this conduct and the conduct further described herein, Worth has engaged, is engaging, or is about to engage in conduct in violation of Sections 4(a), 4b(a)(2)(A) – (C), 4d, and 6(c)(1) of the CEA, 7 U.S.C. §§ 6(a), 6b(a)(2)(A) – (C), 6d, 9(1) (Supp. IV 2011),

and Section 180.1(a) of the regulations promulgated under the CEA ("Regulations"),
17 C.F.R. § 180.1(a) (2012).  Wilshire and Mildner are also liable for these violations as control persons of Worth because they failed to act in good faith or knowingly induced the acts constituting Worth's violations.

12.     Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this complaint, or in similar acts and practices.

13.     The CFTC accordingly brings this action pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1 (Supp. IV 2011), to enjoin Defendants' unlawful practices and to compel their compliance with the CEA and Regulations.  In addition, the CFTC seeks restitution, rescission, civil monetary penalties, and such other equitable relief as this Court may deem appropriate.

## JURISDICTION AND VENUE

14.     Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a) (Supp. IV 2011) authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the CEA or any rule, regulation, or order thereunder.

15.     With respect to Defendants' financed transactions, the Commission has jurisdiction over the conduct and transactions at issue pursuant to Section 2(c)(2)(D) of the CEA, 7 U.S.C. § 2(c)(2)(D) (Supp. IV 2011).  Worth entered into or offered to enter into financed transactions with non-eligible contract participants, or, in the alternative, controlled financed agreements, contracts, or transactions entered into by non-eligible contract participants and members of Worth's network of introducing metals firms.

16.     With respect to Defendants' fully-paid transactions, the Commission has jurisdiction over the conduct and transactions at issue pursuant to Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (Supp. IV 2011).

17.     Venue properly lies with the Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (Supp. IV 2011), because Defendants transact business in this District and certain transactions, acts, practices, and business alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

## THE PARTIES

18.     Plaintiff **United States Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with administering and enforcing the CEA and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2012).

19.     **Worth Group Inc.** ("Worth") is a Florida corporation formed in June 2002 that has previously gone by the names of Wilshire Capital Management Corp. and Worth Bullion Group Inc.  Worth describes itself as "a Florida-based precious metals wholesaler [that] might also be described as a dealer or broker of precious metals."  Worth's business office is located at 3900 Military Trail, Ste. 500, Jupiter, Florida, 33458.  Worth has never been registered with the Commission in any capacity.

20.     **Eugenia Mildner** resides in Jupiter, Florida, is the only current officer and only current director of Worth, and oversees Worth's business and operations and its relationships with introducers, customers, and depositories.  According to the company's January 2012 annual report filed with the State of Florida, she serves as the company's president, secretary, and treasurer.  Mildner has held all of these positions with Worth since October 12, 2009.  Mildner is the sister of defendant Wilshire.  She has never been registered with the Commission in any capacity.

21.     **Andrew Wilshire** resides in Jupiter, Florida, and is the founder and 100% owner of Worth.  According to the company's corporate filings with the State of Florida, Wilshire

5

served as Worth's president, secretary, treasurer, and as the corporation's only Director from June 2002 through October 2009, when Mildner assumed those positions.  Wilshire is actively involved, on a daily basis, in Worth's business and operations and its relationships with introducers, metals suppliers, depositories, and customers.  He negotiates Worth's purchases of precious metals from metals dealers, and developed the system pursuant to which Worth purports to make delivery to Worth's customers.

22.       For the vast majority of the period from August 1994 to March 2007, Wilshire was registered with the Commission as an associated person of one or more Commission registrant firms.  In September 2004, the Commission sued Wilshire, current Worth agents James Russo and Eric Malcolmson, and Wilshire Investment Management Corporation ("WIMC"), which Wilshire ran as president and CEO, alleging commodity option-related fraud in violation of the CEA and Regulations.  *See CFTC v. Wilshire Inv. Mgmt. Corp.,* No. 04-80862-Civ-Middlebrooks/Johnson (S.D. Fla.).  Following a bench trial, the Court found Russo and Malcolmson liable for solicitation fraud, found Wilshire liable for those violations as a controlling person of WIMC, and further found Wilshire liable for failing to diligently supervise WIMC employees.   The Division subsequently filed an administrative action to revoke WIMC's registration as an introducing broker.  Concurrently with the revocation of WIMC's registration, Wilshire's registration status as an associated person of WIMC, his last registration with the Commission, was withdrawn on March 15, 2007.

**STATUTORY BACKGROUND**

23.       Effective July 16, 2011, the Dodd-Frank Act broadened the scope of the CFTC's jurisdiction to include financed commodity transactions with retail customers.  The new Section 2(c)(2)(D) of the CEA, 7 U.S.C. § 2(c)(2)(D) (Supp. IV 2011), applies, subject to certain exceptions, to "any agreement, contract, or transaction in any commodity" that is entered into

with, or offered to, a non-eligible contract participant ("ECP") "on a leveraged or margined

basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror

or counterparty on a similar basis," with respect to conduct occurring on or after July 16, 2011.

24.     Such retail commodity transactions are subject to Sections 4(a), 4(b), and 4b of

the CEA, 7 U.S.C. §§ 6(a), 6(b), 6b (Supp. IV 2011) "as if" they are a contract of sale of a

commodity for future delivery.  Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii)

(Supp. IV 2011).  As a result, these transaction must be executed on an exchange and are

subjected to anti-fraud provisions as set forth in Sections 4(a) and 4b of the CEA, 7 U.S.C.

§§ 6(a), 6b (Supp. IV 2011).

25.     The CEA defines an ECP, in relevant part, as an individual who has amounts

invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the

individual enters into the transaction to manage the risk associated with an asset owned or

liability incurred, or reasonably likely to be owned or incurred, by the individual.  Section

1a(18)(xi) of the CEA, 7 U.S.C. § 1a(18)(xi) (Supp. IV 2011).

26.     Section 4(a) of the CEA, 7 U.S.C. § 6(a) (Supp. IV 2011), in relevant part, makes

it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or

conduct any office or business anywhere in the United States for the purpose of soliciting,

accepting any order for, or otherwise dealing in any transaction in, or in connection with, a

contract for the purchase or sale of a commodity for future delivery unless the transaction is

conducted on or subject to the rules of a board of trade that has been designated or registered by

the Commission as a contract market.

27.     Section 4b(a)(2) of the CEA, 7 U.S.C. § 6(a)(2) (Supp. IV 2011), in relevant part,

makes it unlawful for any person, in or in connection with any order to make, or the making of,

any contract of sale of any commodity for future delivery that is made, or to be made, for, on behalf of, or with any other person, other than on or subject to the rules of a designated contract market:  (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement, or willfully to enter or cause to be entered for the other person any false record; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contact for, on behalf of, or with the other person.

28.     Effective August 15, 2011, Section 753 of the Dodd Frank Act amended Section 6(c) of the CEA, 7 U.S.C. § 9(1) (Supp. IV 2011) and broadened the CFTC's anti-fraud jurisdiction as set out in Regulation 180.1, 17 C.F.R. § 180.1 (2012).

29.     Section 6(c)(1) of the CEA, in relevant part, makes it unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of Regulation 180.1.

30.     Effective August 15, 2011, Regulation 180.1, in relevant part, makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage, or attempt to

8

engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

## DEFENDANTS' UNLAWFUL SCHEME

### I.     Worth's Business Activities

#### A.  Basic Nature of Worth's Business

31.     Worth holds itself out as a dealer in physical precious metals.  The overview of "our products" on Worth's website states, in its entirety: "As an investor in precious metal bullion, you are taking control of your own capital, unlike throwing wealth into non-tangible stocks in an unstable economic environment, with bullion, you know exactly where your money is going: straight into hard assets."

32.     Worth sells precious metals to retail customers on both a fully-paid basis, in which customers pay the full purchase price in return for precious metals, as well as on a financed basis, in which customers pay a portion of the purchase price and finance the remainder through Worth.

33.     The majority of Worth's business is financed business.  In financed transactions, customers pay a portion of the purchase price of the metal, and Worth provides financing directly to the customers by purportedly loaning them the unpaid portion of the purchase price.  Worth then charges the customers interest on that loan.

34.     Worth conducts business exclusively over-the-counter, as Worth does not execute any of its precious metals transactions on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for precious metals.

35.     Worth secures retail customer business using a network of soliciting firms ("introducers") that perform sales functions and introduce customers to Worth.  Worth's

introducers do not buy or sell any metal themselves.  Instead, they merely accept customer orders and funds, extract a large commission out of the funds, and then forward the orders and remaining funds to Worth.

36.     Introducer websites, many of which are designed using a "website generator" that Worth provides to its introducers, and many of which Worth uses to provide customers with their monthly account statements, commonly advertise themselves as dealing in physical bullion, including by describing their products as "tangible assets," "hard assets," or "spot market physical precious metals."  Like Worth, introducers also juxtapose the purported security of their "physical" offerings against the shortcoming of "paper assets."

37.     Worth's customer base consists mostly or exclusively of individual retail investors with aggregate discretionary investments of less than $5 million who use their Worth accounts for speculative purposes rather than because they are involved in a line of business related to precious metals.

### B.  Worth's Account Agreement and Control of Customer Transactions

38.     Worth designed and oversees the structure of all customer transactions, which it controls through parallel sets of Account Agreement documents that Worth enters into with the introducer and that the introducers enter into with the customers (collectively, "Account Agreement").  The Account Agreement is approximately 30 pages long and provides information on the nature of the transactions, the various fees associated with the transactions, and information on financing.

39.     As part of its disingenuous attempt to portray itself as engaged in wholesale rather than retail transactions, Worth does not enter into the Account Agreement directly with its customers.  Instead, Worth requires that all customers enter into the Account Agreement with their introducer, and requires the introducer to enter into a virtually identical version of the

10

Account Agreement with Worth.   The end result is that Worth controls the structure of its customer transactions through its Account Agreement.

40.     In the alternative, if retail customers enter into a financed agreement or contract with their introducer, Worth nevertheless controls, executes, confirms, and provides the financing involved in the leveraged transaction as a whole.

41.     Worth does not provide its customers and introducers with written information regarding the nature of Worth transactions beyond the Account Agreement and the Commodity Title Transfer Notice documents described below.

42.     Both versions of Worth's Account Agreement state that it "constitutes the entire and whole Agreement among the parties and is intended as a complete and exclusive statement of the terms of their agreement."

43.     As Worth's owner and president, respectively, and as the two people primarily responsible for managing Worth, Wilshire and Mildner are responsible for the representations contained in Worth's Account Agreement.

### C.  Order Placement and Transaction Completion

44.     Worth customers place orders to buy or sell metals by contacting a Worth introducer.  After a customer communicates an order to an introducer, the introducer then contacts Worth to complete the customer's transaction.  Worth does so by entering the transaction into Worth's data system.

45.     The customer's transaction or contract with Worth is complete no later than the point at which Worth enters the transaction into its data system to finalize it.

### D.  The Structure of Worth's Financed Transactions

46.     In a common financed transaction, customers leverage their transactions at 2.5 to 1, meaning, for example, that a customer could deposit $10,000 to purchase $25,000 worth of

11

metal.  In an initial customer transaction, the customer submits this $10,000 deposit to the customer's introducer.

47.      Throughout most of the relevant period, upon receipt of customer funds, introducers extract a commission for their role in introducing the customer to Worth.  Worth dictates that the commission not exceed 15% to ensure that Worth receives enough customer money after the commission is removed to margin the transaction.  The introducer commission is taken not as a percentage of a customer's account contribution (*i.e*., 15% of $10,000), but instead as a percentage of the leveraged purchase amount (*i.e*., 15% of $25,000).  So, when a customer deposits $10,000 as in the example above, they are immediately charged an up-front introducer commission of $3,750, or 37.5% of their initial deposit.

48.      The remaining funds, in this example, $6,250, are then submitted to Worth to purchase the $25,000 of metal for the customer's account.  Crediting these funds against the purchase amount, the remaining $18,750 is then considered the customer's "loan balance" at Worth.

49.      Worth also charges all new customers a $200 account opening fee, which is immediately added to the customer's loan balance.

50.      The bulk of Worth's revenues then come from: (1) charging a spread of 3-5% above what Worth believes to be the current spot market price of the metal; (2) charging customers storage fees for the metals in their accounts; and (3) charging customers interest on their "loan balance."  Worth sets its interest charge at 4.5% above the prime rate, which it has recently charged at an annual rate of 7.75%.  Even though Worth often does not have metal to sell to customers at the time of their transaction and only secures the metal at some later time,

Worth begins charging customers interest immediately following its acceptance of the customer transaction.

51.     The effect of Worth's interest and storage charges is that the equity (or "margin") in a customer account – the value of a customer's metal less their "loan balance" at Worth – is constantly eroded by additions to the customer's loan balance.

52.     Worth also allows its introducers to impose additional charges beyond their commission by charging and keeping an additional spread of up to another 1% on metals prices beyond that charged by Worth.  With respect to financed customers, Worth also allows its introducers to charge up to an additional 2% interest beyond that charged by Worth, bringing potential customer interest charges to 9.75%.

53.     These various spread and interest charges combine to quickly reduce the equity in customer accounts, and to place the viability of the customer account at risk.  When the equity in a customer account is reduced to 10%, customers are deemed subject to a margin call, and must send additional funds to Worth to supplement the equity in the account.  If they are unable to do so, Worth liquidates the customer account at a loss, which is done by the end of the day on which the account fell below the 10% equity threshold, without the customer's permission.  With certain very limited exceptions, Worth does not provide its customers with any notice prior to liquidating their account.

54.     The various charges imposed on customer accounts also mean that the price of precious metals must appreciate tremendously just for the customer to break even on their investment.  Assuming an introducer commission of 15%, total Worth and introducer interest charges of 9.75%, a total Worth and introducer purchase price spread of 4%, and the typically assessed monthly storage fees of $.25 per ounce, a customer purchasing metals at a market price

of $1600 would break even on their investment only if the metals reached a market price of $2039.58 by the end of the first year of the investment, an increase of 23.5%.

55.     Of the 1,388 Worth customer accounts that were opened following the effective date of Dodd-Frank, 55% no longer had an open metals position as of December 31, 2012, less than a year and a half later.  Over 92% of those customer accounts lost money as a result of their investment with Worth, with customer losses totaling well over $13 million.

56.     The mechanics of Worth's fully-paid transactions work similarly to the financed transactions except that customers do not use financing to make the initial metals purchase.

### E.  Worth's Misrepresentations Regarding Delivery of Physical Metals

57.     In connection with both financed and fully-paid transactions, Worth represents through the Account Agreement that it will deliver precious metals to customers in return for their payment.  It falsely represents that all transactions "involve delivery within at most 28 days of the date of purchase."

### 1. Fully-Paid Customers

58.     Worth represents to fully-paid customers through the Account Agreement that it will deliver precious metals either to the customer, to the customer's agent or designee, or to a depository used for safekeeping precious metals.  In most instances, Worth fails to do so.

59.     Worth further represents that "[i]f the precious metals are purchased for the Customer in London, they will be allocated to the Customer by a member of the London Bullion Market Association ('LBMA') and may be held in the United Kingdom according to the allocation rules of the LBMA."  This statement is false.

60.     An LBMA "allocated account" is an account that holds balances of uniquely identifiable bars, plates, or ingots of metal allocated to a specific customer and segregated from other metal held in a dealer's vault.  The customer has full title to this allocated metal, with the

14

dealer holding it on the customer's behalf as custodian.  The allocated account is held in a customer's name.

### 2. Financed Customers

61.     Worth falsely represents to financed customers through the Account Agreement that while it will not deliver metals directly to a customer before the entire purchase price is paid, it will in all cases deliver purchased metals in the full amount of the financed purchase to a depository "within 28 days or such lesser period as required by law."  This commitment is described herein as Worth's "customer obligation."

### F.  Worth's Customer Accounts

62.     Following customer transactions, Worth carries and administers customer accounts.  Worth tracks the value of positions in customer accounts in its internal databases.

63.     Worth creates month-end statements for customer accounts and provides them to customers by mail or by online access, either through Worth's own website or through the website of one of its introducers.  Worth customer account statements frequently misrepresent that Worth had timely delivered metals to both fully-paid and financed customers who had not yet received delivery of any metals from Worth.

64.     Worth routinely charges customers interest at the outset of their transaction, prior to delivering any metal to the customers, and thus prior to extending any credit to the customer. Worth has even charged some customers storage fees for metals that Worth had not yet delivered to the customer.

65.     By way of example, one Worth customer who had purchased 400 ounces of platinum during August and early September of 2011 had not received delivery of a single ounce of platinum by the end of October 2011, but had already been charged over $6500 in interest and nearly $950 in storage fees by that time.

## II.  Worth's Failure to Make Timely Actual Delivery on Financed Transactions

### A.  Nature of Worth's Failure to Deliver to Financed Customers

66.     By Worth's own contractual terms, its delivery of metals is not complete until metals are transferred to a subaccount held in a customer's name.

67.     In cases in which Worth delivers metals into a customer subaccount, Worth causes delivery of the metals to Diamond State Depository ("Diamond State"), a metals depository located in New Castle, Delaware.  Worth does not always have the metal it sells to customers at the point of the customer transactions, so Worth periodically orders metals shipped to Diamond State, which places them in a "master account" in Worth's name.  To make "delivery" of these metals to customers, Worth asks Diamond State to move the metals from Worth's master account to a subaccount held in the customer's name.  In this way, ownership of metals is transferred directly from Worth to its customers.

68.     Worth created and uses a document called a "Commodity Title Transfer Notice" ("Transfer Notice") that confirms customer transactions by purportedly providing notification that title to metal had been transferred to them.  Worth sends the Transfer Notices, together with corresponding mailing labels, to Diamond State and directs Diamond State to send the Transfer Notices to Worth's customers following a purported title transfer.

69.     The Transfer Notice document, which Worth deems by its terms part of the Worth Account Agreement, provides that "[t]ransfers of commodities in the custody of Custodian are not complete unless reflected on Custodian's records."  As a result, the actual delivery of commodities from Worth to a customer is not complete until metals are transferred into a customer subaccount by Diamond State.

70.     The Transfer Notice document also demonstrates Worth's direct contact with its customers.  Following delivery of their precious metals to a depository, Worth's leveraged

16

customers are instructed through the Commodity Title Transfer Notice document discussed below to contact Worth directly should they seek information regarding the status of their account.

71.     Worth frequently fails to make timely actual delivery to its retail customers. Despite the CEA's provision that off-exchange financed transactions are generally unlawful if not delivered within 28 days, Worth has failed to implement a procedure for the delivery of precious metals that ensures that each customer's metal is delivered within 28 days of entering into the transaction with Worth.

72.     Worth also does not have any formal procedure or use any computer system to track its inventory of precious metals, determine the date by which it needs to make actual delivery in order to lawfully conduct its business off-exchange, or to track the dates on which it has actually delivered the metal to each customer for each transaction.

### B.  Scope of Worth's Failure to Deliver to Financed Customers

73.     Worth has frequently failed to deliver sufficient precious metals to financed customer subaccounts within 28 days of purchase, as it represents to customers it will.  Worth's failure causes it to misrepresent the nature of the product it sells, and leaves its customers with undisclosed counterparty risk in the form of exposure to Worth's financial stability.

74.     Out of 270 tested business days between August 15, 2011 and September 11, 2012, Worth failed to make timely actual delivery to its financed customers because it:

(a) Did not allocate sufficient metal to customer subaccounts at Diamond State (for at least one of the four metals Worth offers) to meet its customer obligations on at least 220 of the 270 days.

(b) Did not allocate sufficient silver to customer subaccounts at Diamond State for at least 36 days, with a maximum single-day shortage relative to its customer obligations of over 143,000 ounces, which represented over 25% of Worth's total silver obligation and was worth approximately $5.9 million at that time.

17

(c) Did not allocate sufficient gold at Diamond State for at least 18 days, with a maximum single-day shortage relative to its customer obligations of over 1160 ounces, which was worth approximately $1.95 million at that time. Worth's maximum single-day shortage on a percentage basis relative to the size of its customer obligation was over 20%.

(d) Did not allocated sufficient platinum at Diamond State for at least 224 days, with a maximum single-day shortage relative to its customer obligations of 785 ounces, which was worth approximately $1.28 million at that time. Worth's maximum single-day shortage on a percentage basis relative to the size of its customer obligation was over 89%.

(e) Did not allocate sufficient palladium at Diamond State for at least 120 days, with a maximum single-day shortage of over 1200 ounces, which represented over 70% of Worth's total palladium obligation and was worth over $900,000 at that time.

75.     Worth intentionally or recklessly misrepresented to its prospective customers and customers that it makes timely actual delivery to all customers within 28 days of the transaction date.

76.     Wilshire and Mildner failed to implement an adequate supervisory system that would have ensured that customers received actual delivery of their metal within 28 days.

77.     Wilshire and Mildner are aware that Worth fails to deliver metal to its customers within 28 days. Wilshire was primarily responsible for securing precious metals for delivery to customers. Mildner shared primary day-to-day responsibility, along with James Russo, for Worth's metals allocations at Diamond State.

78.     Wilshire and Mildner directly or indirectly induced Worth's failure to make actual delivery to its customers within 28 days.

79.     Wilshire and Mildner were aware that during at least two periods of time, and specifically, during September and November of 2011, Worth failed to make timely actual delivery of precious metals to customers. In early- to mid-September 2011, Worth failed to make timely delivery with respect to all four precious metals in which it dealt, including silver shortages stretching over at least eight days with a market value that at times neared $6 million.

18

In the second half of November 2011, Worth consistently failed to make timely delivery of palladium and platinum, with the palladium shortfall at times exceeding $800,000 in market value.

80.     Worth nevertheless continued to represent to customers and prospective customers throughout the relevant period that it always makes actual timely delivery of precious metals to financed customers.

### III.     Worth's Failure to Purchase or Deliver Metal in Fully-Paid Transactions
####         A.  Worth's Unlawful Handling of Fully-Paid Transactions

81.     In connection with fully-paid customer transactions, Worth routinely failed to deliver physical metals to customers as promised in the Account Agreement.

82.     Following receipt of orders for fully-paid transactions during most or all of the relevant period, Worth customarily neither purchased any physical metals for, nor delivered any such metals to, its customers.  Instead, Worth recorded and tracked customer orders and delivery obligations in its own internal systems, and then merely attempted to "cover" those obligations by trading financial metals derivatives in Worth's own proprietary "margin" or "spot deferred" trading accounts.

83.     Worth's trading in its derivatives accounts does not involve the shipment, receipt, or storage of any physical metals.  Worth's derivatives accounts therefore do not provide Worth with an inventory of physical metal that it can sell to customers in connection with fully-paid transactions.

84.     Despite paying the full value of their purchased metals, most of Worth's fully-paid customers throughout the relevant period thus did not receive any precious metals, but only a paper entry of an obligation in Worth's internal bookkeeping system.  Worth thus ironically attempts to secure actual precious metals for at least some financed customers (who pay only a

deposit on their leveraged metals purchase), while typically purchasing no metal at all for those customers who pay in full.  Worth's misrepresentations were highly material to customers who believed they were purchasing physical precious metals rather than a paper entry in Worth's records.

85.     Even though Worth fails to secure physical metals for fully-paid customers, it nevertheless fraudulently charges those customers storage fees for their "metal," as well as undisclosed interest on those storage fees.

**B.  Worth's Use of Its Account at Baird to Cover Fully-Paid Transactions**

86.     From July 2011 through August 2012, Worth conducted its derivatives trading in an account it held at Baird & Co. ("Baird"), a precious metals firm based in London.

87.     Worth's account at Baird was a "spot deferred" account.  Worth's positions at Baird did not involve the purchase of physical metals.  When Worth opened positions in its spot deferred account, it did not receive title to any precious metals, and could receive title only upon payment of the debit balance.  As a result, neither Worth nor Worth's customers obtained title to or actual delivery of any precious metals when Worth opened spot deferred positions to cover customer purchases.

88.     Contrary to Worth's representations to customers that metals purchased in London would be held in an allocated account, Worth's account at Baird was not allocated.

**C.  Worth's Use of Its A-Mark Account to Cover Fully-Paid Transactions**

89.     Beginning in August 2012, Worth began conducting its derivatives trading activity related to fully-paid purchases at A-Mark Precious Metals Inc. ("A-Mark"), located in Santa Monica, California.

90.     Worth opened a trading account at A-Mark known alternatively as a "spot deferred," "deferred delivery," or "margin" account, which functions similarly to Worth's account at Baird.

91.     A-Mark does not store or deliver any metals to Worth as a result of Worth's entry into spot deferred contracts.  Spot deferred contracts are financially-settled transactions, meaning that they do not involve the delivery of any metals.  As a result, A-Mark has never delivered any precious metals to Worth as a result of Worth's spot deferred contracts.

92.     Neither Worth nor its customers receive title to or actual delivery of any precious metals as a result of Worth's derivatives trading at A-Mark.

### D.  Wilshire and Mildner's Role

93.     Both Wilshire and Mildner were and are aware of the nature of the Baird and A-Mark accounts as derivatives trading accounts rather than accounts in which Worth secured or secures physical metal for customers.  Wilshire was the Worth agent primarily responsible for opening and trading in the accounts, and Mildner executed Worth's agreement with A-Mark.  Wilshire and Mildner nevertheless have caused Worth to cheat and defraud the fully-paid customers by failing to purchase physical metal while representing throughout the relevant period that it delivered physical metals to fully-paid customers.  In furtherance of this scheme, Wilshire and Mildner caused Worth to charge fully-paid customers storage fees for their non-existent metal.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

**Fraud in Violation of Section 6(c)(1) of the CEA and Regulation 180.1(a)(1)-(3)
with Respect to Fully-Paid Transactions**

94.     Paragraphs 1 through 93 are realleged and incorporated herein by reference.

95.     Through the conduct described in paragraphs 1-13, 31, 36, 38-43, 57-60, 62-65, and 81-93 above, including by misrepresenting the basic and material proposition that Worth purchased and stored precious metals for or on behalf of fully-paid customers when it in fact did not, from August 15, 2011 until at least November 8, 2012, Worth intentionally or recklessly has:

A.     used or employed, or attempted to use or employ, a scheme or artifice to defraud in connection with contracts of sale of commodities in interstate commerce;

B.     made, or attempted to make, in connection with contracts of sale of commodities in interstate commerce, untrue or misleading statements of material fact, or omitted to state material facts necessary to make the statements made not untrue or misleading; and/or

C.     engaged, or attempted to engage, in acts, practices, or courses of business that operated or would have operated as a fraud or deceit on Worth's customers.

96.     Therefore, as a result of the foregoing conduct, Worth's fraudulent conduct has violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (Supp. IV 2011), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2012).

97.     The acts, omissions, and failures of Wilshire, Mildner, and other officials, agents, or persons acting for Worth described in this Complaint have occurred within the scope of their

employment, agency, or office with Worth, and are deemed to be the acts, omissions, and failures of Worth by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (Supp. IV 2011), and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

98.     Wilshire and Mildner have controlled Worth and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Worth's violations alleged in this count.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2006), Wilshire and Mildner are liable for Worth's violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (Supp. IV 2011), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2012), as controlling persons.

99.     Each use or employment or attempted use or employment of any manipulative device, scheme, or artifice to defraud; untrue or misleading statement of fact, omission of material fact necessary to make statements not untrue or misleading; or act of engaging, or attempting to engage, in acts, practices or courses of business that operated or would have operated as a fraud or deceit on Worth's customers is alleged as a separate and distinct violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (Supp. IV 2011), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2012).

## COUNT TWO

### Unlawful Off-Exchange Transactions in Violation of Section 4(a) of the CEA with Respect to Financed Transactions

100.     Paragraphs 1 through 93 are realleged and incorporated herein by reference.

101.     As discussed in paragraphs 1-13, 19-22, 31-37, 46-56, 61, and 66-80 above, between July 16, 2011, and the present, Worth, Wilshire, and Mildner have offered to enter into, entered into, executed, confirmed, or conducted an office or business in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in agreements, contracts, or

transactions in commodities (the "Retail Commodity Transactions") on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis, with persons who are not eligible contract participants or eligible commercial entities as defined by the CEA, and who are not engaged in a line of business related to precious metals.

102.   Pursuant to Section 2(c)(2)(D)(iii) of the CEA, 7 U.S.C. § 2(c)(2)(D)(iii) (Supp. IV 2011), the Retail Commodity Transactions are subject to Section 4(a) of the CEA, 7 U.S.C. § 6(a) (Supp. IV 2011), as if they are contracts of sale of a commodity for future delivery.

103.   The Retail Commodity Transactions have not been made or conducted on, or subject to, the rules of any board of trade, exchange, or contract market.

104.   Worth has therefore violated Section 4(a) of the CEA, 7 U.S.C. § 6(a) (Supp. IV 2011), by offering to enter into, entering into, executing, confirming the execution of, or conducting any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with retail commodity transactions, other than on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

105.   The acts, omissions, and failures of Wilshire, Mildner, and other officials, agents, or persons acting for Worth described in this Complaint have occurred within the scope of their employment, agency, or office with Worth, and are deemed to be the acts, omissions, and failures of Worth by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (Supp. IV 2011) and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

106.     Wilshire and Mildner have controlled Worth and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Worth's violations alleged in this count.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2006), Wilshire and Mildner are, in addition to their direct liability, also liable for Worth's violations of Section 4(a) of the CEA, 7 U.S.C. § 6(a) (Supp. IV 2011), as controlling persons.

107.     Each act of offering to enter into, entering into, executing, confirming the execution of, or conducting any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, retail commodity transactions, other than on or subject to the rules of  a board of trade that has been designated or registered by the Commission as a contract market, is alleged as a separate and distinct violation of Section 4(a) of the Act, 7 U.S.C. § 6(a) (Supp. IV 2011).

### COUNT THREE

### Fraud in Violation of Section 4b(a)(2)(A) – (C) of the CEA with Respect to Financed Transactions

108.     Paragraphs 1 through 93 are realleged and incorporated herein by reference.

109.     Through the conduct described in paragraphs 1-13, 31, 36, 38-43, 57, 61-65, and 66-80 above, between July 16, 2011 and the present, Worth has cheated or defrauded retail customers, or has attempted to cheat or defraud retail customers, has willfully made or caused to be made to retail customers false reports or statements, or has willfully deceived or attempted to deceive retail customers in regard to orders for, or the disposition or execution of, retail commodity transactions.

110.     Specifically, Worth has misrepresented to customers that Worth delivered physical metals in the full amount of their financed purchase within 28 days of purchase when Worth often has not in fact delivered metal within that time period.  As a result, Worth has

misrepresented material facts regarding the counterparty risk associated with financed investments, and has defrauded financed customers into believing that they have purchased physical metals that have not been delivered as promised.

111.    Worth has made these representations knowingly or with a reckless disregard to their truth or falsity.

112.    Pursuant to Section 2(c)(2)(D)(iii) of the CEA, 7 U.S.C. § 2(c)(2)(D)(iii) (Supp. IV 2011), the Retail Commodity Transactions are subject to Section 4b of the CEA, 7 U.S.C. § 6b (Supp. IV 2011), as if they are contracts of sale of a commodity for future delivery.

113.    Therefore, as a result of the foregoing conduct, Worth has violated Section 4b(a)(2)(A) – (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A) – (C) (Supp. IV 2011).

114.    The acts, omissions, and failures of Wilshire, Mildner, and other officials, agents, or persons acting for Worth described in this Complaint have occurred within the scope of their employment, agency, or office with Worth, and are deemed to be the acts, omissions, and failures of Worth by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (Supp. IV 2011), and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

115.    Wilshire and Mildner have controlled Worth and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Worth's violations alleged in this count.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2006), Wilshire and Mildner are liable for Worth's violations of Section 4b(a)(2)(A) – (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A) – (C) (Supp. IV 2011), as controlling persons.

116.    Each act of cheating or defrauding or attempting to cheat or defraud retail customers, willfully making or causing to be made to retail customers false reports or statements,

or willfully deceiving or attempting to deceive retail customers in regard to orders for, or the disposition or execution of, retail commodity transactions, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) – (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A) – (C) (Supp. IV 2011).

### COUNT FOUR

### Violation of Section 4d of the CEA for Failure to Register with Respect to Financed Transactions

117.    Paragraphs 1 through 93 of this Complaint are realleged and incorporated herein by reference.

118.    The Dodd Frank Act amended the definition of "futures commission merchant" in the CEA to include any individual, association, partnership, corporation, or trust that, among other things, is engaged in accepting orders for any agreement, contract, or transaction described in Section 2(c)(2)(D)(i) of the CEA, 7 U.S.C. § 2(c)(2)(D)(i) (Supp. IV 2011).

119.    Through the conduct described in paragraphs 1-13, 31-56, and 66-80 above, during the relevant period, Worth, through its agents and employees, accepted orders for agreements, contracts, or transactions described in Section 2(c)(2)(D)(i) of the CEA, 7 U.S.C. § 2(c)(2)(D)(i) (Supp. IV 2011).

120.    Section 4d of the CEA, 7 U.S.C. § 6d (Supp. IV 2011), provides that it shall be unlawful for any person to be a futures commission merchant unless such person shall have registered with the Commission as a futures commission merchant.

121.    During the relevant period, Worth has failed to register with the Commission as a futures commission merchant and has therefore violated Section 4d of the CEA, 7 U.S.C. § 6d (Supp. IV 2011).

122.    The acts, omissions, and failures of Wilshire, Mildner, and other officials, agents, or persons acting for Worth described in this Complaint have occurred within the scope of their

employment, agency, or office with Worth and are deemed to be the acts, omissions, and failures of Worth by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (Supp. IV 2011), and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

123.    Wilshire and Mildner have controlled Worth and have not acted in good faith or have knowingly induced the acts constituting the violations of Worth described in this Count. Pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2006), Wilshire and Mildner are therefore liable as controlling persons for Worth's violations of Section 4d of the CEA, 7 U.S.C. § 6d (Supp. IV 2011).

### RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the CEA, 7 U.S.C. § 13a-1 (Supp. IV 2011), and pursuant to its own equitable powers:

A.   Find Defendants liable for violating Sections 4(a), 4b(a)(2)(A) – (C), 4d, and 6(c)(1) of the CEA, 7 U.S.C. §§ 6(a), 6b(a)(2)(A) – (C), 6d, 9(1) (Supp. IV 2011), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2012).

B.   Enter an order of permanent injunction enjoining Defendants and all persons insofar as they are acting as Defendants' agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendants who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.   Engaging in conduct in violation of Sections 4(a), 4b(a)(2)(A) – (C), 4d, and 6(c)(1) of the CEA, 7 U.S.C. §§ 6(a), 6b(a)(2)(A) – (C), 4d, 9(1) (Supp. IV 2011), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2012);

2.   Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the CEA, 7 U.S.C. § 1a (Supp. IV 2011));

3.   Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2012)) ("commodity options"), security futures products, foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the CEA, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i) (Supp. IV 2011)) ("forex contracts"), and/or swaps (as that term is defined in Section 1a(47) of the CEA, 7 U.S.C. § 1a(47) (Supp. IV 2011), and as further defined by Regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx) (2012)) ("swaps") for their own personal account or for any account in which they have a direct or indirect interest;

4.   Having any commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps traded on their behalf;

5.   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps;

6.   Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps;

7.   Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and/or

8. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2012)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (Supp. IV 2011)) registered, exempted from registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012);

C. Enter an order requiring Defendants to disgorge to any officer appointed or directed by the Court, or directly to customers, all benefits received, including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the CEA as described herein, including pre-judgment and post-judgment interest;

D. Enter an order requiring Defendants, as well as any of their successors, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity whose funds were received or utilized by them in violation of the provisions of the CEA and/or Commission Regulations, as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

E. Enter an order directing Defendants and any successors thereof to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any of the customers whose funds were received by Defendants as a result of the acts and practices which constituted violations of the CEA as described herein and restore to each customer the full amount of his or her original investment;

F. Enter an order directing each Defendant to pay a civil monetary penalty in the amount of not more than the greater of: (1) triple the monetary gain to Defendants for each violation of the CEA or Regulations; or (2) $140,000 for each violation of the CEA or Regulations;

G.  Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2); and

H.  Enter an order providing such other and further relief as this Court may deem necessary

and appropriate under the circumstances.

Date: August 13, 2013                                  Respectfully submitted,


                                                       */s/ Theodore Z. Polley III*
                                                       Theodore Z. Polley III (tpolley@cftc.gov)
                                                       Bar ID # A5501866
                                                       William Janulis (wjanulis@cftc.gov)
                                                       Bar ID # A5500865
                                                       Rosemary Hollinger (rhollinger@cftc.gov)
                                                       Bar ID # A5500849
                                                       U.S. Commodity Futures Trading Commission
                                                       525 West Monroe Street, Ste. 1100
                                                       Chicago, IL  60661
                                                       Ph:  (312) 596-0551
                                                       Fax: (312) 596-0714