# EXHIBIT A



**Marty Steinberg**
Tel  305-350-7310
Fax  305-351-2130
msteinberg@bilzin.com

January 13, 2014

The Honorable Kenneth L. Ryskamp
Senior United States District Judge
Paul G. Rogers Federal Building and United States Courthouse
701 Clematis Street, Room 416
West Palm Beach, FL 33401

Ms. Rosemary Hollinger
Mr. William Janulis
Mr. Theodore Polley, III
Commodity Futures Trading Commission
525 W. Monroe Street, Suite 1100
Chicago, IL  60661

Re:  **U.S. Commodity Futures Trading Commission v. Worth Group, Inc., et al., Case No.: 13-cv-80796-KLR**

Dear Judge Ryskamp, Ms. Hollinger, Mr. Janulis, and Mr. Polley:

It is my understanding that a monitor may be called for to comply with a consent order related to the Worth Group, Inc.  Because of my prior experience as a federal monitor, I am apparently one of the persons recommended as a candidate for Corporate Monitor.  The purpose of this letter is to briefly summarize my qualifications as a corporate monitor and set out a proposal of staffing and fees for myself and my team.  I will be happy to provide any further information regarding my credentials or those of my team.

**Qualifications and Credentials**

Our team recently completed a 15-month Monitorship of Exactech, Inc. ("Exactech"), a medical device company based in Florida.  That monitorship was under the supervision of Assistant United States Attorney Scott McBride (Scott.McBride@usdoj.gov) of the District of New Jersey.  I was appointed the monitor and most of the individuals I have suggested for the Worth Group Monitorship assisted me in the Exactech Monitorship.  As discussed below, I and my team have extensive experience in counseling companies with respect to compliance issues.  This experience, as well as my experience as the Exactech Monitor, will redound to the benefit

of Worth Group and the CFTC, because we previously have analyzed and fashioned procedures, policies, and strategies to enhance compliance.

For your convenience, I have attempted to summarize my experience below. I also am enclosing a résumé.

In addition to the experience noted, if there is or will be congressional interest in this matter or the subject matter, it may also be important to select a monitor who can withstand scrutiny from Congress and the press, as well as a monitor who possesses the qualifications needed for this important role. I have been fortunate to have been appointed to a number of similarly demanding roles throughout my career, providing me with extensive experience and knowledge to act as a monitor. From 1971 to 1977, I served as a trial prosecutor for the U.S. Department of Justice in Miami, and from 1977 to 1979, I served as the Chief of the New York offices of the U.S. Department of Justice Organized Crime Strike Force. From 1979 to 1982, I served as Chief Counsel to the U.S. Senate Permanent Subcommittee on Investigations. In these roles, I conducted numerous investigations of, and monitored, public and private entities that owned or controlled billions of dollars in assets.

As a federal prosecutor, I initiated the investigation and prosecution of national labor unions and their health and welfare and pension plans. I also developed the innovative use of RICO to seize control of labor unions and their funds, to reform them, institute compliance programs, and monitor them for compliance. Partly because of this activity, I was selected as the Chief Counsel of the United States Senate Permanent Subcommittee on Investigations. At the time I held the position, it was the largest standing committee in the Senate. During the time I was Chief Counsel, we performed many investigations of money laundering, FCPA violations, kickbacks, tax evasion, and organized crime's role in corrupting public and private entities. Many of these investigations led directly to legislative reform. We also performed oversight inquiries of many government agencies, issued reports suggesting revisions to their investigative and monitoring roles, and monitored their compliance. As a result, these agencies were restructured to make them more effective and efficient to monitor labor unions, health and welfare funds, pension plans, and public and private businesses. We also convened hearings on the Teamsters Central States Pension Plan and played a key role in reforming and restructuring the Teamsters Pension Plan to protect the participants. After negotiating the restructuring, we monitored the Teamster's Plan compliance.

During my tenure in private practice, I chaired a large litigation group at Holland & Knight LLP, then had the honor of serving on the three-man management committee that managed the Holland & Knight law firm. I subsequently opened and managed the Miami office of Hunton & Williams LLP, while serving as the co-head of litigation and a member of the Executive Committee of the entire firm. I currently co-chair the litigation department at Bilzin Sumberg Baena Price & Axelrod LLP, a large Florida law firm. We routinely represent Fortune 100 companies in congressional investigations, internal investigations, and civil, criminal, and regulatory matters, and I am a member of both the American College of Trial Lawyers and the International Academy of Trial lawyers.

Through the years, I have been selected as a Receiver/Trustee for various entities such as labor unions and pension and health and welfare funds, as well as commercial hedge funds. My experience as Chief Counsel of a Senate Subcommittee and my representation of many parties before Congressional Committees assist in anticipating Congressional interest and, in the event that a Congressional inquiry is initiated, assisting the company and the government in addressing Congressional inquiries in a knowledgeable and experienced fashion.

I currently serve as the federal court-appointed SEC Receiver of the Lancer Group of hedge funds, which at one point had solicited well over $1 billion in investments. The case, which commenced in July 2003, involves two offshore hedge funds incorporated in the British Virgin Islands, and one domestic hedge fund which operated out of New York City. Our receivership team quickly recovered books, records, and other assets, reviewed hundreds of thousands of documents, ascertained, located and preserved the value of securities, managed complex litigation against auditors, fund administrators, insiders, and recipients of fraudulent transfers, coordinated with foreign regulatory agencies, oversaw investigations, interpreted unorthodox financial statements, interviewed and deposed hundreds of witnesses, pursued assets offshore, and addressed the concerns of disgruntled onshore and offshore investors. Although prior to my appointment investors had no expectation of any recoveries, they have and will receive meaningful distributions, in large part as a result of the work that our receivership team performed. To date, we have succeeded in recovering over $100 million in assets for the benefit of investors in the Funds, and we have reduced the amount of claims against the Funds by $1.8 billion.

With respect to compliance, I and my team have performed many inquiries which led to the implementation or enhancement of compliance programs for many multinational companies which included compliance programs for FCPA, anti-bribery, health care fraud and abuse, securities violations, and many other federal and state alleged improprieties. I also have performed many internal investigations and restructurings, initiated compliance programs, and monitored private and union entities that have been involved in such conduct.

If appointed as monitor, I will have substantial expertise to draw upon from my experience as the Monitor of Exactech. I also have team members and professionals who assisted me in the Lancer Receivership, the Exactech Monitorship, and participated in significant internal investigations for Fortune 500 companies. Further, in the Exactech Monitorship we created and provided a Monitor's Plan, an Audit Plan, an Audit Checklist, a Compliance Program, Interview Question Lists, Running Task Lists, regular Status Reports to the Department of Justice and the Company, Employee and Board Member Training Materials, and Recommendations and Proposed Policies and Procedures. From our understanding of the scope of the Worth Group Monitorship, it appears that similar documentation and processes may be required of the Worth Group Monitor.

What might also be of interest to you is that, when necessary, I closely coordinate these activities with sophisticated former federal investigators who have been an integral part of the receiverships and monitorship that I have supervised. These seasoned former federal agents have

decades of experience in internal investigations, compliance programs, and monitoring. The investigators can be a significant economic and professional aid in the Monitorship and reduce costs and fees.

**The Scope of the Monitorship**

Obviously, we understand that our role is limited and unique. We would monitor Worth Group within the scope of the forthcoming order mandating appointment of a monitor. That role appears to encompass three general points: (1) to review Worth Group's practices with regard to having sufficient metal on hand to cover customer accounts; (2) to review Worth Group's practices regarding timely delivery of metal, pursuant to the CEA 28-day rule; and (3) analyzing Worth Group's ability to be a legally compliant entity on a going-forward basis. Of course, there are a number of issues that may be relevant to these three aspects of the monitorship, such as the following non-exclusive list:

a. The role of the custodian(s) of the metal
b. Financial consequences of custody, storage and lending practices and fees
c. Worth's relationship with the parties in privity with the buyers
d. The Account Agreement and the adequacy of disclosures therein
e. Promotional and Web Site representations as accurate advertisements
f. Commissions and fees
g. The NERA Study
h. Margin call practices and procedures
i. Representations and/or omissions on Account Statements
j. Worth's procedures and computer tracking systems
k. Transfer notices and procedures
l. Worth's pool of metal at the custodians and allocations to customers and delivery to customers through documented title receipt
m. Issues relating to the use of derivatives to cover customer accounts and potential additional risks as a result, including counterparty risk, and the adequacy of disclosure of same.
n. Dodd Frank requirements and implementation
o. Compliance programs and procedures

We have prepared master work plans in our prior engagements to ensure that all areas of concern are addressed efficiently, and we believe our current economies of scale will allow us to prepare a cost-effective and efficient work plan to address the issues identified in the forthcoming order mandating appointment of a monitor. We also have a significant database of processes, materials, policies, compliance procedures and the like, from our prior engagements and the completed Exactech Monitorship that we could adapt to the Worth Group matter, saving substantial costs and time.

**Proposal of Staffing and Fees**

We recognize the importance of delivering cost-effective services. Our practice is to prepare strategic plans to identity the issues that need to be addressed and detailed plans as to how to effectuate our goals -- all of which will be shared with all necessary parties for comment and integration.

I anticipate having the following individuals to assist me as Worth Group Monitor, and we will bill at a blended rate of $445 per hour. Please note that this blended rate does not include any potential use of investigators, who provide services based on an "as-needed" basis determined by the scope of the work to be conducted.

    Marty Steinberg, Esq. (partner)

    Justin Brenner, Esq. (associate)

    Beth Moon (paralegal)

One of the benefits of hiring our team is that there will be no need for additional legal costs, as we will not hire outside counsel, which likely would be required by any non-attorney monitor. By maintaining a small team, we are able to minimize costs by eliminating the potential for redundant work. Further, it is our practice not to charge for any travel time, which we expect would be minimal given the proximity of our office to Worth Group's office and the Palm Beach County federal courthouse.

Our team members understand the importance of a corporate monitor and the need to provide monitorship services efficiently, so as to maintain the assets of the corporation. We are qualified and capable of serving effectively as the Worth Group Monitor, in accord with the scope of the monitorship. Should you wish to receive further information about myself or my team, I will be happy to provide it.

Sincerely,

*Marty Steinberg*

Marty Steinberg

Enclosure

MS