UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-cv-80796-KLR

U.S. COMMODITY FUTURES
TRADING COMMISSION,

        Plaintiff,

v.

WORTH GROUP, INC.,
ANDREW WILSHIRE, and
EUGENIA MILDNER,

        Defendants.

_____/

## WORTH PARTIES' MOTION TO DISCHARGE CORPORATE MONITOR

Worth Group, Inc. ("Worth"), Andrew Wilshire, and Eugenia Mildner (together the "Worth Parties"), pursuant to the terms of the Consent Order of Preliminary Injunction and Other Ancillary Relief [DE 61] (the "Consent Order") move the Court to enter an order discharging the Corporate Monitor (the "Monitor") and say:

**I. Preliminary Statement**

The Monitor's work is done. As outlined in two detailed reports, she has performed each task that, upon the parties' agreement and the order of this Court, she was assigned. She has (1) evaluated and confirmed the adequacy of the amount of physical metals that Worth holds for each of its end customers; (2) performed an assessment of Worth's current procedures and practices for actual delivery of precious metals to its end customers and its documentation and recordkeeping related to such delivery; and (3) monitored Worth's expenditures and performed

an assessment of and confirmed Worth's ability to be legally Compliant under the Commodity Exchange Act (the "CEA") on an ongoing basis. *See* Consent Order ¶ 4.

Understanding that the Monitor's prompt and thorough performance of her duties would assure the CFTC and this Court that Worth's business practices comply with the law and all Customer metals are accounted for, the Worth Parties have fully cooperated with each and every request of the Monitor. They have provided – at significant cost and in the middle of hotly-contested litigation – complete transparency into Worth's operations and records. They have complied with the Monitor's requests and implemented her suggestions promptly and effectively. They have marshaled the cooperation of Worth's retailers, depositories, and financing sources. They have made thousands of documents available for review. And they have arranged on-site visits as necessary for the Monitor and her team to assess Worth's holdings. These efforts have enabled the Monitor to perform her analysis and determine that adequate physical metal is held and has been properly and timely allocated for each of Worth's end customers, and that Worth is compliant under the CEA, contrary to the allegations in the original motion for preliminary injunction filed by the CFTC.

Given those conclusions, further work by the Monitor, her lawyers, and her accountants would exceed the assignments ordered by this Court and serve only to generate costs that the Monitor herself recognizes Worth cannot continue to bear. This Court, upon agreement of the parties, appointed the Monitor to achieve limited and carefully defined goals, not function as a general watch-dog or an indefinitely-appointed receiver for what is, after all, still very much a going concern. Especially in light of the order entered by this Court upon the stipulation of the Worth Parties and the Monitor on July 17, 2014 [DE 104] (the "Agreed Order"), the interests of Worth's end customers are amply protected.

Having completed the job ordered by the Court, it is time for the Monitor to be discharged. The Monitor, who previously sought and obtained an extension of her appointment to perform her work, takes no position as to this Motion to discharge her now. However, the CFTC inexplicably opposes that relief, despite the undisputed findings of the Monitor the CFTC itself proposed. As set forth below in detail, those findings demonstrate why the extraordinary injunctive relief of continued monitorship at this time would represent an unwarranted, unfair, and prohibitively expensive[1] intrusion into the normal business operations of a closely-held company.

## II.   Background

On January 23, 2014, the Court appointed Melanie Damian, whom the CFTC recommended, as Monitor. Consent Order ¶22. In the intervening six months, she and her professionals have analyzed thousands of transactions; interviewed retailers, customers, and depositories; performed on-site visits to verify that every ounce of metal that Worth purports to hold is actually in its custody; passed upon a major financing transaction submitted for her approval by Worth; and produced two reports.

### A.  The Monitor's First Report Details Worth's Compliance

Before issuing her first report, the Monitor spent six weeks[2] investigating information the Worth Parties and Worth's employees, suppliers, financial institutions, metal depositories and other third parties made available to her, her counsel, and her accountants.

---

[1] The Monitor and her professionals have submitted fee applications to this Court for a total of $156,526.60. Worth has not opposed those applications and has made prompt payment upon order of the Court.

[2] The Consent Order charged the Monitor with completing her report within 30 days. The Worth Parties did not oppose the Monitor's motion for a two-week enlargement of time to complete the report [DE 71] filed on February 20, 2014, which this Court granted on February 25, 2014 [DE 72].

Specifically, with respect to the first of the Monitor's tasks – assessing the adequacy of the amount of metal Worth holds for its retailers' customers – the Monitor reported to the Court that all the metal is fully accounted for:

> The Monitor was also tasked with assessing the size of Worth's physical precious metals delivery obligations and whether Worth holds adequate physical precious metals for all of its customers. The short answer to the question posed is *yes*. Worth does hold sufficient physical precious metals . . . to satisfy its current delivery obligations to all of its end customers as of February 7, 2014.

Corporate Monitor's Report of Conclusions and Recommendations [DE 75] dated March 10, 2014 ("First Report") at 25 (emphasis in original). The First Report contained a detailed assessment of Worth's cash on hand and metals holdings. *Id.* at 18-21, 25.

As to the second task – assessing Worth's delivery practices – the Monitor examined Worth's procedures for making allocations and deliveries at depositories on behalf of end customers, or directly to end customers who have fully satisfied their financial obligations, and concluded that those practices are effective and compliant with the CEA:

> The Monitor's independent research and analysis confirms that Worth has effective procedures in place for the delivery of precious metals on behalf of end customers.
>
> . . . .
>
> The Monitor has also determined that Worth has a satisfactory system in place pursuant to which it does deliver physical metals directly to end customers when requested to do so, as long as the customer has fully paid for the requested metals and for all outstanding fees and charges. The system effectively results in actual delivery of physical metals to customers well within the time required by the [CEA].
>
> . . . .
>
> The Monitor finds that Worth has the data systems in place to accurately process, monitor and maintain end customer precious metals transactions and accounts.

*Id.* at 27-28.  Significantly, the Monitor noted *no* instance in which Worth failed to make delivery to an end customer who fully satisfied his or her payment obligations – whether by making physical delivery or timely allocation.

As to the third task – determining Worth's ability to be legally compliant under the CEA on an ongoing basis – the Monitor concluded that "Worth is complying and should be able to comply with the CEA on an ongoing basis with respect to its metals delivery obligations to its end customers."  *Id.* at 2.[3]  The Monitor "observed an area for concern regarding the financial viability of the Company going forward" in light of its constrained access to financing and her assessment of its financial recordkeeping practices.[4]  *Id.* at 2.  She noted that, in October 2013 (or almost immediately after this litigation was filed), Worth lost its line of credit, which constrained Worth's ability to increase sales to margin account holders and significantly decreased Worth's transaction volume.  *Id.* at 30.  As an additional source of pressure on Worth's financial viability, she noted that "Worth has incurred substantial legal costs as the result of the instant CFTC enforcement action."  *Id.*

In light of those observations, the Monitor recommended "an additional monitor period to assess Worth's plan for improving its financial condition, its ability, subsequent to this Report, to

---

[3] Summarizing Worth's precious metal delivery practices and procedures, the Monitor wrote, "Worth holds a sufficient quantity of actual physical precious metals to cover all current customer allocations.  In addition to the allocated physical precious metals stored by Worth on behalf of end customers, Worth also holds a substantial inventory of unallocated precious metals from which it can and does draw to cover end customer purchases.  Finally, Worth has effective systems and procedures in place for effectuating, documenting, and tracking precious metals purchases and sales on behalf of its retail dealers and end customers which have assured Worth's compliance with the delivery requirements under the Act and continue to assure Worth's current compliance with the Act's requirements."  *Id.* at 29.

[4] While the Monitor detailed what was, in her assessment, the deficiencies in Worth's financial record-keeping practices "to monitor its own financial health and stability," *id.* at 24, she concluded that "Worth has adequate record-keeping procedures in place related to the deliveries of precious metals."  *Id.* at 32.

5

obtain financing, and, importantly, whether there is any impact on the current metals allocation and delivery procedures." *Id.* at 31.  Describing the monitorship period that was to follow, the Monitor stated that she expected it "would require significantly less work but is necessary *until Worth can demonstrate access to capital essential to remain compliant.*"  *Id.* at 32 (emphasis added).

### B.     Worth Addresses the Monitor's First Report

Worth took immediate action to address the Monitor's concerns.  First, in consultation with the Monitor's forensic accountants, Worth engaged Hylton Wynick of Zucker Forensics, a Certified Forensic Accountant, to prepare regular internal books, records, and reports on an ongoing basis to comport with the recommendations outlined in the First Report.  *See* Curriculum Vitae of Hylton Wynick, CIRA, Cr.FA, attached as Exhibit A.  Furthermore, Worth continued to provide, on a weekly basis, information regarding all the company's allocations of precious metals, bank accounts, and transactions for the Monitor's review and analysis.

Second, notwithstanding the considerable obstacles posed by this litigation, the provisions of the Consent Order, and the presence of the Monitor, Worth continued discussions with potential sources of additional financing.  As a result of those efforts, Worth arrived at a series of proposed agreements with a financing source, then sought and obtained the consent of the Monitor to enter into those agreements.  *See* Monitor's Letter of May 29, 2014 [DE 92-6]. As a condition of her approval, the Monitor required that, "within thirty (30) days after [entering the financing transactions] or, alternatively, upon discharge of the Monitor, whichever is earlier," she and the Worth Parties jointly file a stipulation for entry of an agreed order containing certain restrictions on Worth's use of the funds it would receive as a result of the transactions.  *Id.*  The

6

stipulation was filed on July 2, 2014.  *See* Stipulation for Entry of Agreed Order dated July 2, 2014 [DE 98].

The Court entered the Agreed Order jointly proposed by the Monitor and the Worth Parties.  The Agreed Order, which on its face contemplates that it shall remain in effect following the Monitor's discharge, requires, in summary, that until entry of a final judgment in this case or otherwise ordered by the Court or agreed to by the parties:  (1) the funds transferred to Worth in connection with and as the result of the financing transaction must be used in accordance with the terms set forth in the transaction agreements; (2) Worth must maintain normal business operations, consistent with its current practices, to the extent commercially feasible, and compliant with the CEA, during the term set forth in and defined by the one of the transaction agreements; and (3) during that term, Worth will not liquidate and distribute its assets to the extent that doing so would cause Worth to have insufficient working capital to remain compliant with its obligations under the CEA, would render Worth insolvent, would render Worth incapable of performing certain obligations, or would otherwise jeopardize retail customers' rights.  *See* Agreed Order.

    **C.**    **The Monitor's Second Report Details Worth's Continued Compliance**

On June 9, 2014, shortly after the financing transactions closed, the Monitor issued a Second Status Report of Conclusions and Recommendations [DE 92] (the "Second Report").  As to the adequacy of Worth's precious metals holdings, the Monitor concluded that "Worth continues to hold adequate physical precious metals to satisfy its delivery obligations to all of its end customers."  Second Report at 4; *see also id.* at 8 ("Should all of Worth's end customers pay off the financed portions of their holdings, as well as all outstanding fees owed to Worth, Worth does appear to be able to meet delivery obligations to all of its customers based on the amounts

7

of metals in its inventories."). The Monitor confirmed that Worth holds metals at its depositories on behalf of retailers' end customers in amounts sufficient to cover all its metal transactions – over 1.2 million ounces of silver, as well as thousands of ounces of gold and hundreds of ounces of platinum and palladium. *Id.* at 7.[5] These holdings are in addition to the unallocated metal that Worth holds at the depositories and elsewhere. *Id.* Indeed, in light of these millions of dollars' worth of precious metals actually held by Worth, the Monitor drew a sharp contrast between Worth and Hunter Wise Commodities, LLC, another company for which she had served as a court-appointed monitor and receiver, in that Hunter Wise "had never taken delivery of *any* metals as a result of its trades and had *no* metals to deliver in connection with these retail commodity transactions." *Id.* at 10 n.7 (internal citations omitted) (emphasis added).

Moreover, the Monitor highlighted continued progress in Worth's allocation and delivery practices and improved recordkeeping by Worth since her first reporting period, which had resulted in a reduction in the average delivery time of from four days to three (calculated from the time of any given order to allocation at Worth's depositories) – well short of the 28-day deadline under the CEA. *Id.* at 5-6, 9.[6] In light of the weekly allocation report summaries,

---

[5] "Importantly," the Monitor noted, "the inventory records do identify the individual customers on behalf of whom the metals are stored based on allocation information provided by Worth. Thus, the Monitor is able to determine whether adequate metals are stored on behalf of each individual end customer based on end customer transaction records." *Id.* at 7 n.5. The Monitor went on to state that Worth must authorize the delivery from a depository to an end customer, and that "Worth will *generally* give such consent after confirming that the end customer has paid all outstanding fees and costs owed to Worth." *Id.* (emphasis added). As stated above, the Worth Parties are aware of *no* instance in which such consent has been withheld, and the Monitor has directed them to no such instance.

[6] The Monitor "found [Worth's] depositories to be prompt and cooperative in responding to routine requests from the Monitor for up-to-date inventory reports," which Worth actively facilitated by coordinating with counsel to those depositories. *Id.* at 5. The Monitor also noted that "Worth has effectively cleaned up its own internal data by accounting for its own Master

depository reports, and other facts reviewed, the Monitor found no further analysis of Worth's practices for actual delivery of precious metals warranted under the Consent Order. *Id.* at 8.

Turning to Worth's ability to comply with the CEA on an ongoing basis, the Monitor concluded that "Worth continues to have the ability to be legally compliant under the CEA on an ongoing basis insofar as the delivery of precious metals is concerned." *Id.* at 10. With respect to Worth's "financial viability," the Monitor noted that "Worth continues to incur substantial legal costs as the result of the CFTC enforcement action." *Id.* at 12. However, she noted, "Worth did significantly limit the compensation and distributions to its key employees and other spending significantly during this period in compliance with the Consent Order." *Id.*

The Monitor then described the positive impact of the financing transaction that she had approved. She explained that the "agreements . . . should enable Worth to generate the revenue necessary to sustain its ongoing operations and to return to profitability by increasing the volume of end customer metals transactions and thereby grow its business." *Id.* at 13.[7] She concluded that "the agreements will likely lead to increased revenues and profitability and, thereby, long-term financial stability," and thus, "the agreements, in conjunction with the Agreed Order, will help ensure Worth's ability to be legally compliant under the CEA on an ongoing basis." *Id.* at 14.

---

Account inventories separate from customer sub-account inventories, making inventory analyses easier." *Id.* at 6.

[7] In her concluding assessment that "Worth's sustainability and financial well-being are in the best interests of the company and of its end customers," the Monitor states that Worth's end customers' metals "are [now] collateral securing third-party financing." *Id*. at 15. In fact, the transaction between Worth and its counterparty effected a sale of certain loans, not a pledge of the loans by Worth to its counterparty. Accordingly, each end customer's metal secures only that financing extended to that end customer, and the transaction affected no additional collateralization of any end customer's metal.

9

As her final recommendation, the Monitor asked to "remain in place as the financial transactions unfold and monitor the ongoing compliance issues for at least the short-term." *Id.* at 15.  She acknowledged that her evaluation of Worth's progress could cause her to make further recommendations before the conclusion of an additional 90-day reporting period.  *Id.*

### III. Argument

Because no further monitorship is required or appropriate to achieve the ends of the Consent Order, the Monitor should be discharged.

The Consent Order contemplates that when the Monitor completes the job she is ordered to do, she will either be discharged, or given additional responsibilities.  The Order expressly provides that any of the parties "may move the Court pursuant to this Order for a hearing on any of the Corporate Monitor's conclusions or recommendations, to request that the Corporate Monitor assume additional responsibilities, or to request that the Court discharge the Corporate Monitor of his or her duties."  Consent Order ¶ 34.  Whether to discharge a corporate monitor in these circumstances, like appointing one, is an equitable matter reserved simply to the discretion of the Court.  *See SEC v. Vescor Capital Corp.*, 599 F.3d 1189, 1197-98 (10th Cir. 2010) (describing similar discretionary considerations in the appointment of a receiver); *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009) (same).  Accordingly, in determining whether the Monitor should be discharged, the Court begins with the same considerations that motivated her appointment, determining whether, upon the reports submitted, further relief is warranted under the circumstances.  In weighing those considerations, the Court considers the facts as they currently exist to determine whether the burdens of the injunctive relief sought are necessary to preserve the *status quo* or provide complete relief to the party seeking the injunctive relief.  *See CFTC v. Sterling Trading Grp., Inc.*, 605 F. Supp. 2d 1245, 1290-91 (S.D. Fla. 2009); *SEC v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir. 2004); *CFTC v.*

*Commodities Fluctuations Sys., Inc.,* 583 F. Supp. 1382, 1385 (S.D.N.Y. 1984) (denying motion to enjoin defendant because, among other reasons, it took steps to correct problems once on notice and gave sincere assurances that it would fulfill its obligations in the future).

Since the First Report, it has been clear that Worth holds adequate physical metal for its end customers, timely and properly allocates physical metal with well-recognized depositories, and has a business model that complies with the CEA. Had the Monitor reached those conclusions and no others, she would have discharged her obligations under the Consent Order. In support of its motion for a preliminary injunction, the CFTC characterized as "wholly unsubstantiated" Worth's claim that it "holds sufficient metal to cover all of its customer obligations." Reply in Further Support of Motion for an Order of Preliminary Injunction [DE 42] at 18. The Monitor's findings – including that every ounce of metal that Worth purports to hold on behalf of end customers is where it should be – substantiates what Worth has been saying all along in this litigation about the adequacy of its holdings.

Moreover, in response to the Monitor's recommendations regarding Worth's access to financing and financial record-keeping, the Worth Parties built upon the transparency and cooperation they had demonstrated from the start of the monitorship by retaining – at substantial cost – an accountant identified by the Monitor's staff to prepare regular financial reports. They also negotiated a financing transaction to improve the company's liquidity and ensure that, the costs of this litigation notwithstanding, it can remain a going concern, able to comply with the CEA.

While it is true the Monitor was given task of monitoring Worth's expenses, that task was directed to a specific, now accomplished, end. *See* Consent Order ¶ 4 (the Monitor shall "monitor Worth's expenditures *and perform an assessment* of Worth's *ability* to be legally

compliant under the Act on an ongoing basis") (emphasis added). The Court directed the Monitor to perform an assessment of Worth's capacity to comply with the law, not function as a receiver or trustee, appointed to tally expenses with the goal of ensuring that stakeholders can be satisfied from a pool of assets, and to watch over that pool of assets until it had been distributed. The Monitor concluded her First Report by stating that, even in light of the areas she had identified as of concern to her, monitorship would be necessary only "until Worth can demonstrate access to capital essential to remain compliant." First Report at 32. Having determined – after six months of fact-finding and analysis resulting in two detailed reports – that Worth has the ability to be legally compliant under the CEA on an ongoing basis given its holdings and delivery practices, no further review of Worth's expenses is needed under the Consent Order at this time. Indeed, such review can only contribute to the legal and accounting expenses that the Monitor has identified as a substantial threat to Worth's financial health.

In any event, with the Worth Parties' consent and cooperation, adequate safeguards have been established to ensure that the interests of end customers are protected from any risk perceived by the Monitor to arise from Worth's degree of financial stability. The Agreed Order, which expressly contemplates that it will survive the Monitor's discharge, tracks precisely the Monitor's conditions for approval of Worth's financing transaction. Thus, Worth is required by order of this Court to use its recently-obtained financing in accordance with the terms set forth in its financing agreements; to maintain normal business operations as commercially feasible; and not liquidate and distribute its assets to the extent that doing so would cause Worth to have insufficient working capital to remain compliant with its obligations under the CEA, render it insolvent, or jeopardize end customers' rights.

**IV.     Relief Sought**

In light of these facts, the Worth Parties seek an order of this Court in the form of the attached, providing for the immediate discharge of the Monitor, the termination of all her duties and powers under the Consent Order, and related relief. The remaining provisions of the Consent Order, and the Agreed Order in its entirety, would remain effective until further order of this Court.

**CERTIFICATION OF CONFERENCE UNDER LOCAL RULE 7.1(a)(3)**

I HEREBY CERTIFY that counsel for the Worth Parties has conferred with counsel for the Monitor and the CFTC regarding the relief sought in this Motion. The Monitor takes no position with respect to the relief sought. The CFTC opposes the relief sought.

Respectfully submitted,

July 31, 2014

| | |
|---|---|
| By: /s Nathan W. Hill | By: /s Matthew I. Menchel |
| Edward A. Marod, Esq. | Matthew I. Menchel, Esq. |
| Florida Bar No. 238961 | Florida Bar No. 012043 |
| Email: emarod@gunster.com | Email: matthew.menchel@kobrekim.com |
| G. Joseph Curley, Esq. | John D. Couriel, Esq. |
| Florida Bar No. 571873 | Florida Bar No. 0831271 |
| Email: gcurley@gunster.com | Email: john.couriel@kobrekim.com |
| Nathan W. Hill, Esq. | *Attorneys for Defendants Andrew Wilshire and Eugenia Mildner* |
| Florida Bar No. 091473 | |
| Email: nhill@gunster.com | **KOBRE & KIM LLP** |
| *Attorneys for Defendants Worth Group, Inc., Andrew Wilshire, and Eugenia Mildner* | 2 South Biscayne Boulevard |
| **GUNSTER, YOAKLEY & STEWART, P.A**. | 35th Floor |
| 777 South Flagler Drive | Miami, Florida 33131 |
| Suite 500 East | Telephone: (305) 967-6100 |
| West Palm Beach, Florida 33401-6194 | Facsimile: (305) 967-6120 |
| Telephone: (561) 655-1980 | |
| Facsimile: (561) 655-5677 | |

**CERTIFICATE OF SERVICE**

      I hereby certify that, on July 31, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. I further certify that the foregoing document is being served on all counsel of record identified on the list below via transmission of Notices of Electronic Filing generated by CM/ECF:

Rosemary Hollinger
U.S. Commodity Futures Trading Commission
525. W Monroe Street
Suite 1100
Chicago, IL 60661
Tel: (312) 596-0700
Fax: (312) 596-0714
Email: rhollinger@cftc.gov

Elizabeth N. Pendleton
U.S. Commodity Futures Trading Commission
525 West Monroe Street
Suite 1100
Chicago, IL 60661
Tel: (312) 596-0629
Fax: (312) 596-0714
Email: ependleton@cftc.gov

David Chu
U.S. Commodity Futures Trading Commission
525 West Monroe Street
Suite 1100
Chicago, IL 60661
Tel: (312) 596-0642
Fax: (312) 596-0714
Email: dchu@cftc.gov

      /s/ Nathan W. Hill
      Nathan W. Hill, Esq.