**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 13-cv-80796-RYSKAMP/HOPKINS

U.S. COMMODITY FUTURES
TRADING COMMISSION,

                   Plaintiff,

     v.

WORTH GROUP, INC.,
ANDREW WILSHIRE, and
EUGENIA MILDNER,

                   Defendants.

_____/

## THE WORTH PARTIES' MOTION FOR SUMMARY JUDGMENT

     Worth Group, Inc. ("Worth"), Andrew Wilshire ("Mr. Wilshire"), and Eugenia Mildner ("Ms. Mildner"), (together the "Worth Parties"), pursuant to Rule 56, Fed. R. Civ. P., move for summary judgment in favor of the Worth Parties on all claims as there is no genuine issue of material fact and the Worth Parties are entitled to judgment as a matter of law as shown in the following statement of facts and memorandum of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.    There is no Evidence that the Worth Parties Committed Fraud**

    **A. The Dodd-Frank Wall Street Reform and Consumer Protection Act Created Widespread Logistical Problems**

    1.   The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376, signed into law on July 21, 2010, effective July 16, 2011, added Section 2(c)(2)(D) of the Commodity Exchange Act ("CEA"), entitled "Retail commodity transactions." *See* 7 U.S.C. § 2(c)(2)(D) (the "Retail Commodity Transaction Provision"). The Retail Commodity Transaction Provision expanded the scope of the CEA to include "any agreement, contract, or transaction in any commodity that is . . . entered into . . on a leveraged or margined basis . . . ." 7 U.S.C. § 2(c)(2)(D)(i).  Contracts of sale "that result[] in actual delivery within 28 days" are explicitly exempted from the statute. *See* 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa).

    2.   Neither the Retail Commodity Transaction Provision nor the balance of the CEA defines what "actual delivery" means, or how the 28-day period is calculated. The CFTC did not provide any guidance on its interpretation of the Retail Commodity Transaction Provision until December 14, 2011, when it promulgated a proposed interpretation and request for comments. *See* Retail Commodity Transactions Under Commodity Exchange Act, 76 Fed. Reg. 77670 (Dec. 14, 2011). The CFTC received thirteen comments in response to this request, only two of which supported its interpretation.  *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg. 52426 (Aug. 23, 2013). On August 23, 2013, ten days after filing the Complaint in this action, the CFTC issued its final interpretation of the Retail Commodity Transaction Provision, addressing the public comments it had received and clarifying its previous interpretation. *Id.*

    3.   Prior to Dodd-Frank, the sale of a commodity was not considered a future, and thus, not within the regulatory jurisdiction of the CFTC, so long as delivery was anticipated by the parties in their agreements. *CFTC v. Zelener*, 373 F.3d 861, 866 (7th Cir. 2004). Actual or physical delivery of a commodity was not required within any specific time period for jurisdictional purposes under the CEA. *See* Plaintiff's Response in Opposition to Defendants' Motion to Dismiss, D.E. 48 at 15.

4.    This change in controlling law created widespread logistical problems for the precious metals industry, and necessitated industry-wide changes in business practices. Tony Dobra, current CEO of Baird & Co. LTD. ("Baird"), a bullion refiner and merchant and member of the London Bullion Market Association with which Worth had done business prior to Dodd-Frank, testified that depositories or storage vaults "probably had not been geared up ready for the increase in physical movements." Exhibit 1, Deposition of Anthony Dobra, Feb. 5, 2015, at 125-26 (hereinafter, "Dobra Dep."). He explained that "[f]or many years physical metal had just been stored in [a depository's] vault and very rarely did anything come in and out and suddenly now with the new regulations everyone's starting to want to take delivery of metal, so they had not got their systems really up to speed with actually taking regular requests to actually physically move metal out of the vault." *Id.* 125-126. It was also not clear in the months following its enactment, how Dodd-Frank would actually be applied. Dobra Dep., at 111; *see also*, composite Exhibit 2, public comments in response to the CFTC's December 14, 2011, preliminary interpretation. This uncertainty led, in part, to Baird's partial withdrawal from the United States market. Dobra Dep. at 129-130.

5.    During the period of July 16, 2011, through December 21, 2012, the price of precious metals generally declined. Exhibit 3, Expert Report of Matthew A. Evans, [D.E. 34-13], at ¶¶ 38-39 and exhibit 5 thereto (hereinafter, "Evans Report"). Many investors suffered a decline in the market value of the precious metals they owned as a result, including those with accounts at Worth. *Id.*

### B.  Worth Immediately Engaged A Highly Respected Lawyer in the Field and a Well-Known International Law Firm to Assist them in Complying with Dodd Frank

6.    Worth is a Florida-based wholesaler of precious metals. Exhibit 4, Deposition of Eugenia Mildner, Jan. 16, 2015, at 55:13-15 (hereinafter, "Mildner Dep."); Exhibit 5, Deposition of James Russo, Jan. 15, 2015, at 10:15-16 (hereinafter, "Russo Dep."); Corporate Monitor's First Report of Conclusions and Recommendations, March 10, 2014, [D.E. 75] at 7 (hereinafter, "Monitor's First Report").  Its customers consist of a network of independent retail dealers, and one affiliated retailer, who sell to individual end customers. Monitor's First Report at 8. In or around January 2011, the CFTC began investigating the Worth Parties. Exhibit 6, Deposition of Andrew Wilshire, March 11, 2015, at 13-15 (hereinafter, "Wilshire Dep."). The Worth Parties engaged   Greenberg   Traurig,   LLP   ("Greenberg"),   and   attorney   John   Giovannone

("Giovannone")[1] in January 2011, to represent them in the investigation and to bring the business into compliance with Dodd-Frank. Wilshire Dep. at 14, 21. Mr. Wilshire was introduced to Giovannone by another lawyer at Greenberg who told him that Giovannone was a "leader in the precious metals industry." Wilshire Dep. at 14; *see also*, Exhibit 7, John Giovannone LinkedIn Profile, http://www.linkedin.com/in/johngiovannone (last visited Feb. 2, 2015).

7.   Mr. Wilshire was confident in Giovannone's expertise and ability, explaining to Tony Dobra in a May 6, 2011, email that "[m]y attorney John Giovannone used to represent Monex [a leading precious metals firm] and co-authored the Model State Commodity Code . . . . He is by far the most well informed attorney in regards to state and federal regulation. He is one of the lawyers that successfully defended Monex against the CFTC in the late 80's and early 90's." Exhibit 8, May 6, 2011, email from Andrew Wilshire to Tony Dobra. Mr. Wilshire testified repeatedly that he engaged Giovannone to assist Worth in becoming compliant with Dodd-Frank, and was fully confident in Giovannone's ability to do so. Wilshire Dep. at 65, 159, 181, 206.

8.   Giovannone was involved in all of Worth's business decisions in or around the effective date of the Retail Commodity Transaction Provision of Dodd-Frank. Wilshire Dep. at 24, 51 ("He was involved in every single decision in or around that time period.").  He advised the Worth Parties in a variety of matters including negotiations with suppliers such as Baird, Wilshire Dep. at 81-82; Dobra Dep. 59-60, and precious metals depositories such as Diamond State Depository ("Diamond State"). Wilshire Dep. at 21, 236; Exhibit 9, Examination of Michael Clark, April 12, 2012, at 55-56 (hereinafter, "April 12, 2012, Clark Exam.").

<div align="center" style="color:red">Redacted - Under Seal</div>

**C.  Worth Followed Giovannone's Advice Regarding The Fully Paid Transactions**

9.   Through his extensive involvement, Giovannone was aware of every aspect of Worth's business. Wilshire Dep. at 92; Mildner Dep. at 131-132, 151-152; Russo Dep. at 77, 83-84 (". . . we didn't make a move without him"). He was specifically aware of Worth's use of unallocated

---

[1] John Giovannone passed away shortly after this case was filed.

spot-deferred positions,[2] through discussions with Mr. Wilshire, Wilshire Dep. at 63, 65, his negotiations with Baird, Wilshire Dep. at 54; Mildner Dep. at 137; Dobra Dep. 59-60, and in his review of Worth's pre-Dodd-Frank Account Agreements, that contained a specific disclosure regarding Worth's use of cash forward positions.[3] Mildner Dep. at 151-154; Exhibit 11, January 13, 2011, email from Eugenia Mildner to John Giovannone and Andrew Wilshire; Exhibit 12, Worth Bullion Account Agreement, [D.E. 34-7] at § 7  (hereinafter "Worth Pre-Dodd-Frank Account Agreement").

10. Prior to the effective date of the Retail Commodity Transaction Provision of Dodd-Frank, Worth used unallocated spot-deferred positions at Baird to hedge[4] against fully paid and financed customer positions. Wilshire Dep. at 36-37. The Account Agreement used by Worth prior to July 16, 2011, contained a disclosure that Worth may cover its obligations through, among other things, "cash forwards." Wilshire Dep. at 136-37; Worth Pre-Dodd-Frank Account Agreement at ¶ 7.

---

[2] According to Tony Dobra, a "spot deferred account" is "an unallocated account where the actual settlement of the transactions is deferred on a day-by-day basis until the position is either closed out or physical – or the account is settled and delivery made." Dobra Dep. at 12. In explaining the difference between an "allocated" and "unallocated" account, Dobra says "if you think of your bank accounts, your checking account is your unallocated account. It gives you entitlement to a certain value of money with your bank, the bank hasn't actually physically put away dollar bills for your account, but the bank effectively owes you that money. Where -- and the bank, you assume, has the liquidity to honor that money. An allocated account is as if you'd gone to the ATM and actually physically withdrawn dollar bills and put it in -- locked away in a box." Dobra Dep. at 19.

[3] According to Tony Dobra, the difference between a spot deferred transaction and a cash forward "is to do actually with when settlement occurs. On a for – a cash forward transaction, a specific date is agreed when settlement will take place. With spot deferred, that is left open-ended. And, again, that is generally – dates back, you know, times past when you may well be delivering a large con – a consignment of silver by sailing ship. You don't know when that ship's going to arrive. You wish to have the transaction so you know your price is covered but you don't actually know when the actual cargo is going to arrive." Dobra Dep. at 94-95. The CFTC defines a "forward contract" on its website as "[a] cash transaction common in many industries, including commodity merchandising, in which a commercial buyer and seller agree upon delivery of a specified quality and quantity of goods at a specified future date. Terms may be more 'personalized' than is the case with standardized futures contracts (i.e., delivery time and amount are as determined between seller and buyer). A price may be agreed upon in advance, or there may be agreement that the price will be determined at the time of delivery." CFTC Glossary, A Guide to the Language or the Futures Industry, available at, <http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/index.htm#F>

[4] The CFTC defines a "hedger" on its website as "[a] market participant who enters into positions in a futures or other derivatives market opposite to positions held in the cash market to minimize the risk of financial loss from an adverse price change; or who purchases or sells futures as a temporary substitute for a cash transaction that will occur later. One can hedge either a long cash market position (e.g., one owns the cash commodity) or a short cash market position (e.g., one plans on buying the cash commodity in the future)." CFTC Glossary, A Guide to the Language or the Futures Industry, available at, <http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/index.htm#F>

11. Giovannone advised the Worth Parties that Dodd-Frank did not apply to fully-paid or dollar-for-dollar transactions, and that as such, physical metal only needed to be delivered and allocated for financed customers. Wilshire Dep. at 63 ("He [Giovannone] told me that all I needed to do was allocate a financed portion of the precious metal purchased to the depository to pass title to the end user to be in compliance with Dodd-Frank."), Wilshire Dep. at 65, 87, 186-188; Mildner Dep. at 92 ("We would allocate at our depositories our finance customers because we were told by our attorney, John Giovannone, that those were the ones we had to allocate. That we only had to provide our title transfers and allocations to the – that Dodd-Frank only covered financing and the fully pays [sic] were not under that."); *See also*, Exhibit 13, July 7, 2011, email from John Giovannone to Andrew Wilshire.

12. With knowledge and understanding of Worth's business, including its practice of covering fully-paid customer transactions with unallocated spot-deferred positions, Giovannone drafted a new Account Agreement for Worth to use with its retailers.  Mildner Dep. at 117. Giovannone's new Account Agreement did not contain a disclosure, similar to the one contained in Worth's Pre-Dodd-Frank Account Agreement, that it may use unallocated, spot deferred positions in connection with fully-paid transactions. Wilshire Dep. at 154-155, 182-83; Exhibit 14, Worth-Retailer Account Agreement; Monitor's First Report, Ex. B.

13. Giovannone also drafted a mirror Account Agreement that Worth could provide to its retailers for use with their customers. Exhibit 15, Deposition of Gary Sinclair, March 3, 2015, at 114-116 (hereinafter, "Sinclair Dep."). Gary Sinclair, an attorney who represented several retailers that did business with Worth, explained the purpose of the mirror agreements was to ensure compliance with Dodd-Frank, and also to ensure that obligations could properly be assigned from a retailer to Worth. Sinclair Dep. at 124-126, 127-128 ("I mean we were trying to comply with Dodd-Frank totally. That was the whole purpose of doing these documents. We wanted -- you know, myself as much as John Giovannone wanted these to comply with Dodd-Frank. So we -- I tried to work in every way possible to try to have that happen, and part of that, I believe, was drafting the customer document properly.").

14. Giovannone advised the Worth Parties to use the new Account Agreements for all transactions. Mildner Dep. at 151-153, 161-162; Wilshire Dep. at 202-204. In a July 8, 2011 email, Giovannone tells Mr. Wilshire that "[i]t would be a good idea for us to send it [the Account Agreement] out to all of your retailers . . . so that they can begin to work with their own

attorneys to produce the account agreements they will use with their customers *for all transactions after July 15*." Exhibit 16, July 8, 2011, email from John Giovannone to Andrew Wilshire (emphasis added).

15. The Worth Parties trusted in Giovannone's expertise and relied on his advice. Wilshire at 202-203;                    Redacted - Under Seal


*See also* Exhibit 18, February 16, 2012, email from Andrew Wilshire to Tony Dobra (". . . we now fall clearly under the exception in section 742 of the Dodd-Frank act. So our business is not required to register with the CFTC or the SEC."). Specifically, in reliance on Giovannone's advice, the Worth Parties used the Account Agreements drafted by Giovannone for all customer transactions and did not change their practice of covering fully-paid customer purchases with unallocated spot deferred positions. Wilshire Dep. at 95, 186-88.

**D.  The Worth Parties Work Diligently to Correct Giovannone's Error as Soon as They Become Aware of It**

16. On November 26, 2012, the CFTC gave telephonic notice to the Worth Parties of a proposed enforcement proceeding against them and indicating, among other things, the CFTC's belief that Worth "sold metals . . . on a fully paid basis in a manner that violates the anti-manipulation provisions of [the CEA]." *See* Exhibit 19, December 7, 2012, letter from the Worth Parties to David Meister, Director, Division of Enforcement for the CFTC, at 1 (hereinafter, the "Meister Letter"). That very same day, Giovannone sent an email to Mr. Wilshire and James Russo advising them to "make sure there are sufficient metals at [the depositories] to cover the fully paid transactions currently in place." Exhibit 20, November 26, 2012, email from John Giovannone to Andrew Wilshire and Jim Russo. The Worth Parties immediately complied with Giovannone's instruction and purchased metal to cover all fully paid customer positions. Exhibit 21, Declaration of James Russo, ¶¶ 6-7. (hereinafter, "Russo Dec.").

17. On December 26, 2012, Giovannone sent a draft revised account agreement to Mr. Wilshire. Exhibit 22,  Dec. 26, 2012, email from Giovannone to Andrew Wilshire; Exhibit 23, December 2012, Revised Worth/Retailer Account Agreement (hereinafter "Revised Account Agreement"). That agreement contained two significant changes: (1) it added a disclosure in section 4.1 clarifying that only financed transactions involve delivery within 28 days, and (2) it

added a disclosure in section 7.3 that "[i]f neither the Retailer nor its customer is taking physical delivery of precious metals purchased without using financing, Worth may also cover the purchase with offsetting cash forward or other contracts with one or more of its suppliers until physical delivery is required." Revised Account Agreement, ¶ 7.3.

18. After this action was filed in August 2013, the Worth Parties met with Giovannone and several other Greenberg attorneys to discuss the CFTC's allegations in this case. Wilshire Dep. at 265-67; Russo Dep. at 78-79. In the meeting, Giovannone admitted that he failed to include the necessary disclosures in the account agreements for fully paid customers. Wilshire Dep. at 270-71; Russo Dep. at 79. Shortly after this meeting, Greenberg filed a Motion to Withdraw indicating that "it has a conflict of interest that precludes it from continuing as counsel for Defendants in this case." Unopposed Motion to Withdraw as Counsel for Defendants, at ¶ 3 [D.E. 19].

**E.  Worth Intended to Make Timely Delivery for All Financed Transactions**

19. Based on Giovannone's advice and the documents he drafted, Worth implemented a system of allocation and delivery designed to comply with Dodd-Frank. Mildner Dep. at 91-92, 123; Russo Dep. at 34-35. Indeed, at the time, Worth was considered by Giovannone and others to be the only precious metals wholesaler in its industry that was "doing things the right way." Sinclair Dep. at 175-76; Russo Dep. at 85. Even third-parties commented on the Worth Parties efforts to establish a completely compliant business. Dobra Dep. at 121.

20.                              Redacted - Under Seal

                                                                              The Court-appointed Corporate Monitor in this matter, who had been proposed as a monitor by the CFTC in the parties' proposed consent order resolving the CFTC's motion for preliminary injunction, found that this practice "*effectively accomplish[es] the actual delivery* of sufficient physical precious metals to fulfill end customer purchases on a timely basis and within the

twenty-eight days required by the CEA," Monitor's First Report at 2 (emphasis added).  The CFTC never objected to this finding.[5]

21. Worth also implemented procedures to track the amount of metal it had on reserve at depositories and in its own on-site safes. Russo Dec., ¶ 3; Mildner Dep. at 56-57, 120-121, 144; Wilshire Dep. at 228-29. Worth was constantly purchasing metal during this period to ensure it could meet its delivery requirements. Wilshire Dep. at 244, 246; Exhibit 24, July 29, 2011, email from Tony Dobra to Andrew Wilshire. Several unforeseen events occurred that delayed delivery of metal into a depository, including deliveries to the wrong depository. Wilshire Dep. at 240-46; Dobra Dep. at 124-26 ("Q. Do you recall whether there were -- well, is it fair to call that a hiccup maybe the delivery process? A. Possibly a hiccup, but I understood from the shipping company that went in to collect the bars that this happened on a regular basis."); Composite Exhibit 25, emails between Tony Dobra and Andrew Wilshire regarding delivery delays. Weather events also delayed delivery of precious metals purchased by Worth. Wilshire Dep. at 243; *see also*, Composite Exhibit 26, August 2011 and October 2012, emails from Tine Ervin at Diamond State.

22. Despite these delays, during the period between July 16, 2011 and December 31, 2012, 94.6 percent of financed customer transactions (5,734 out of a possible 6,060) were allocated within 28 days. *See,* Exhibit 27, Expert Report of Michael Quinn at 19 (hereinafter, "Quinn Report"); *see also* Evans Report, and exhibit 1 thereto.

23. After learning of these delays, the Worth Parties made changes to their procedures to ensure timely delivery, including streamlining the electronic allocation system and purchasing larger quantities of metal on a regular basis. Wilshire Dep. at 246; Russo Dec. at ¶ 4; July 26, 2012 Clark Exam., at 10-12.

24. No retailer that purchased from Worth and no retail customer that purchased from a retailer dealing with Worth has ever complained that it lost money as a result of Worth's failure timely to make an allocation. Russo Dec., ¶ 5. Indeed, there is no evidence that transactions resulting in delivery shortly after 28 days pose any greater risk than those resulting in delivery within 28 days. Quinn Report,  ¶ 56.  The CFTC expert witness argued that customers who did

---

[5] The CFTC sought leave to amend its complaint in order to articulate a new theory of "actual delivery," under which the Corporate Monitor's work would have been rendered moot, inasmuch as delivery to a depository would not have sufficed as "actual delivery" under the statute.  *See* Proposed Amended Complaint at ¶ 5 [DE 109-1].  The Court denied the motion for leave to amend.  [DE 131].

not receive timely delivery of precious metals were "totally exposed" to the creditworthiness of Worth. Exhibit 28, Expert Report of Daniel Driscoll, at 4.  However, the CFTC has provided no evidence or empirical support of this assertion. Quinn Report at ¶ 56. Nor is the CFTC capable of quantifying this risk.

25. As of no later than January 2013, Worth's record of timely allocation is perfect. *See,* Quinn Report, ¶ 19; *see also* Evans Report, ¶ 15; Indeed, the Corporate Monitor in this case found that Worth has been in full compliance with the CEA's delivery requirements from September 16, 2013 through the termination of the monitorship on October 14, 2014. *See* Monitor's First Report at 25; Corporate Monitor's Second Status Report of Conclusions and Recommendations, June 9, 2014, [DE 92] at 6; Corporate Monitor's Third Status Report of Conclusions and Recommendations, September 9, 2014, [DE 120] at 9.

**II.**   **Using a Straightforward Methodology, an Independent Consulting Firm Found Only 326 Financed Transactions Delivered Outside of the 28-Day Dodd-Frank Delivery Period**

    **A.**   **The Independent Consulting Firm NERA and The Independent Summary Witness Matthew Evans Have Extensive Experience Analyzing the Type of Data at Issue Here**

26. The independent consulting firm, National Economic Research Associates, Inc. ("NERA"), under the guidance of Matthew Evans, conducted an examination of Worth's delivery of metal for financed transactions during the relevant period: July 2011-December 2012. *See* Evans Report, at ¶ 18, Ex. 1; *see also* Exhibit 29, Deposition of Matthew Evans, at 159:11-159:20 (hereinafter, "Evans Dep.").

27. NERA is a global economic consulting firm which provides strategies, studies, reports, expert testimony, and policy recommendations to government authorities, corporations, and law firms.

28. Mr. Evans is a Senior Vice President in the Global Securities and Finance Practice at NERA.  Mr. Evans has spent six years in the markets with several derivatives business and ten years as a derivatives trading expert working with major commercial firms, marketers, hedge funds and major global financial institutions. *See* Evans Dep. at 74:17-74:22; Evans Report at ¶¶ 1-8.

    B.   **NERA Created a Summary Exhibit Using a Single Data Source and a Straightforward Consistent Methodology to Match Allocations with Transactions**

29. Worth processed the trades of its end-customers using a proprietary user interface referred to as the "loan calculator," which in turn stored all of Worth's transactional data on a Structured Query Language (SQL) database. *See* Russo Dep. 26:22-27:07; Exhibit 30, Deposition of Kendall Dixon, at 16:10-17:04, 70:03-70:13 (hereinafter, "Dixon Dep."). For each purchase or sale of metal, the SQL database assigned a unique transaction ID. *See* Dixon Dep. at 92:05-92:10.

30. In order to effectuate an allocation, Worth would select the transactions to be allocated, thereby electronically tying each allocation to a prior metals purchase via the unique transaction ID, as well as the depository at which the metal would be allocated. *See* Dixon Dep. at 45:06-45:18, 48:11-49:20. When an allocation was completed, the SQL database assigned an allocation date, which represented the date upon which the allocation request was communicated to one of Worth's depositories. *See* Evans Dep. at 134:18-135:17.

31. Using data from Worth's SQL database, NERA matched up metal purchases with subsequent allocation requests for those metals.  *See* Evans Dep. at 152:15-153:02, 168:12-169:21; *see also* Evans Report, at ¶¶ 16-18.  Because NERA's methodology primarily used a single data source with the same underlying source code—Worth's SQL database—for evaluating the timeliness of Worth's metal allocations, NERA was able to link transaction to allocation, ensuring a reliable computerized matching process.  *See* Evans Dep. at 169:22-170:16.

32. In instances in which a customer transaction did not match with an allocation request within Worth's SQL database—often because the customer transaction was voided, the customer sold the metal back before the allocation was made, the transaction was for an internal account, or the trade was actually a fully paid transaction (and thus outside of the 28-day requirement)—NERA then reviewed additional records, to find either the corresponding allocation, the voided transaction, the offsetting sale, or the internal account indication. *See* Evans Dep. at 173:20-175:06.

33. Using this methodology, NERA created a summary exhibit (the "Evans Summary Exhibit").  The Evans Summary Exhibit finds that from July 2011 to December 2012, Worth failed to allocated metal within 28 days on 326 total transactions *See* Evans Report, Ex. 1.  This is less than 5% of all transactions.  *Id.*

## MEMORANDUM OF LAW

### I.      Introduction

Always intending to comply with the law governing them, since early 2010 the Defendants, Worth Group, Inc., Andrew Wilshire and Eugenia Mildner (collectively, the "Worth Parties") have gone to extraordinary lengths, and extraordinary expense, to bring their business in line with the strictures of the CEA as modified by Dodd-Frank on July 16, 2011.  As determined by the independent corporate monitor appointed by this Court, after a comprehensive independent investigation, also at great expense, the Worth Parties succeeded in bringing their business totally in line with the applicable law. Now, after two years of pre-litigation investigation involving the production of thousands of pages of documents and several witness examinations, followed by two years of litigation, the production of thousands more pages of documents and the taking of eighteen depositions throughout the country (and one in the United Kingdom) at unnecessary additional cost to the Worth Parties, the CFTC has no evidence that the Worth Parties intentionally committed fraud under the Act or purposefully engaged in transactions involving the actual delivery of precious metals outside the 28-day period specified by Dodd-Frank.  This Court should put an end to this inquisition and enter summary judgment in favor of Defendants on all claims.

In the months leading up to the July 16, 2011, effective date of Dodd-Frank, John Giovannone ("Giovannone"), a former CFTC attorney with significant experience in commodities law, sent several emails to the principles of another precious metals business advising them to stop accepting orders and close down their businesses if they could not deliver precious metal "to a depository which issues the equivalent of an non-negotiable warehouse receipt to the ultimate customer, within 28 days of the sale." *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC,* 21 F. Supp. 2d 1317, 1331 (S.D. Fla. May 16, 2014). After a bench trial, this Court found that those individuals ignored these, and other warnings, deliberately chose to "risk it" and even joked about having "adjoining cells." *Id.* at 1332. At the same time they were joking about the implications of the new law, the Worth Parties were completely overhauling their business based on Giovannone's advice in an effort to come into full compliance with Dodd-Frank.

By the time the new law went into effect on July 16, 2011, the Worth Parties had already endured six months of CFTC investigatory subpoenas and examinations, with Giovannone by

their side. Despite that diversion, the Worth Parties and Giovannone negotiated with suppliers, depositories, and retailers to ultimately put in place a system of delivery and allocation that the CFTC itself could not fault – at least, until it changed its mind.[1] Indeed, during the period relevant to the CFTC's allegations, Worth was considered by Giovannone and others to be the only precious metals company in its industry that was "doing things the right way." SOF ¶ 19. Between July 16, 2011, and December 31, 2012, 94.6 percent of purchases were timely delivered despite logistical delays outside of Worth's control and the overall confusion created by Dodd-Frank. SOF ¶¶ 4, 22.

After a two-year investigation and extensive discovery in this case, the CFTC has no evidence that the Worth Parties committed fraud. On the contrary, the undisputed material evidence shows that the Worth Parties devoted a substantial amount of time and money in their efforts to comply with Dodd-Frank. They hired an experienced attorney and consulted him on every business decision that implicated the new law between January 2010 and August 2013. With his assistance, Worth developed a delivery and allocation process designed to specifically comply with Dodd-Frank's prescriptions. Throughout this case, the Worth Parties have continued to demonstrate their unwavering intention to comply with Dodd-Frank. They agreed to a preliminary injunction imposing a corporate monitorship and personal financial strictures, restructured their internal bookkeeping practices, hired an accountant, and obtained outside financing to maintain their compliant operations at the recommendation of Corporate Monitor. When the Corporate Monitor found that the CFTC's favored theory for putting Worth out of business held no water, the CFTC tried to amend its complaint and articulate an entirely new theory of liability.  This Court correctly put a stop to that.  It should now put a stop to this litigation altogether.

---

[1] *See* Plaintiff's Response in Opposition to the Motion to Dismiss, [D.E. 48] at 16 ("The Commission's Complaint does not allege that there is anything violative with Worth's practice of making "actual delivery" by physically delivering metal to a depository and allocating it to an account held in the customer's name."). *But see*, Plaintiff's Motion for Leave to Amend the Complaint [D.E. 109].

## II.      <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate when the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  The moving party bears the initial burden that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 317 (1986).  The party opposing a motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings, but rather must establish the existence of an element essential to its case and on which it will bear the burden of proof at trial.  *Id.* at 324; *Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div.*, 932 F.2d 1384, 1387-88 (11th Cir. 1991). Accordingly, a court should grant a motion for summary judgment unless the opposing party produces evidence that could reasonably be the basis for a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Moreover, courts do not entertain immaterial or insubstantial doubts as to material facts to defeat a summary judgment motion.  *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).  Rather, an opposing party must come forward with evidence that is "significantly probative," in the sense that it creates an issue which may not be resolved until the trier of fact has the opportunity to assess the credibility of the witnesses. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "Thus, if the evidence presented by the opposing party is 'merely colorable' or 'not significantly probative,' summary judgment may be granted." *In re Fed. Nat. Mortgage Ass'n Sec., Derivative & ERISA Litig.,* 905 F. Supp. 2d 63, 70 (D.D.C. 2012) (citing *Burke v. Gould,* 286 F.3d 513, 520 (D.C.Cir. 2002) (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505); *see also Montgomery v. Chao,* 546 F.3d 703, 708 (D.C. Cir. 2008) ("The possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment.").

**ARGUMENT**

### III.   The Undisputed Material Facts show that the Worth Parties are Not Liable For Fraud Alleged in Counts I and III.

The Worth Parties have spent millions of dollars and countless man-hours in their four-year effort to comply with Dodd-Frank and the CFTC's shifting demands. Despite a two and a half year investigation and vast amount of discovery in this case – over half a million pages of documents, more than a dozen depositions, a seven-month long corporate monitorship – the CFTC has no evidence from which a reasonable jury could conclude that the Worth Parties committed fraud. To the contrary, the undisputed material facts demonstrate that the Worth Parties went to greater lengths than anyone else in the industry to comply with the new law and have continued to demonstrate their good faith efforts throughout this litigation.

In order to establish liability for fraud, the CFTC has the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality. *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1328 (11th Cir. 2002). Failure to establish any one of these elements is dispositive and precludes the CFTC's fraud claims. *Id.*[2] In this case, there is no evidence from which a reasonable jury could conclude that the Worth Parties committed fraud with respect to the allegations in Counts I and III.

#### A.  The Worth Parties did not Commit Fraud with Respect to Financed Customers

Count III of the Complaint presents what appears to be an issue of first impression under the Dodd-Frank regulatory regime: whether an occasional failure to deliver precious metals within a 28-day time frame constitutes fraud, despite substantial evidence of a system designed to ensure timely delivery. The CFTC's Section 4b(a) fraud claim is based on one purported misrepresentation: that Worth, through the so-called "Account Agreement," misrepresented to financed customers that it will "in all cases deliver purchased metals in the full amount of the financed purchase to a depository within 28 days." Compl. ¶¶ 61, 75. It is important to clarify, however, that there is no dispute that metal was, in fact, delivered to financed customers. SOF ¶ 25. There is no dispute that Worth's current procedures "effectively accomplish the actual

---

[2] Although the alleged statutory violations in Counts I and III are different, the elements are the same. *See U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC,* 21 F. Supp. 3d 1317, 1337-38(S.D. Fla. May 16, 2014);   *CFTC v. Smithers,* 9:12-CV-81165-KAM, 2013 WL 4851684 at *8 (S.D. Fla. July 31, 2013); *CFTC v. Leighton,* 2:12-CV-04012-PSG, 2013 WL 4101874 at *4 - *6 (C.D. Cal. July 8, 2013).

delivery of sufficient physical precious metals to fulfill end customer purchases on a timely basis and within the twenty-eight days required by the CEA,"[3] and that Worth's record of timely delivery was perfect for financed transactions as of at least January 2013. SOF ¶ 25. Accordingly, for purposes of the instant Motion, the disputed issues are (1) whether a misrepresentation regarding the delivery of metal within 28 days is material; (2) if so, whether the Worth Parties failed to implement a procedure to ensure that metal was timely delivered; and (3) whether several inadvertent delivery delays render statements regarding delivery in the Account Agreement fraudulent. The undisputed material evidence proves that the answer to each of these questions is a resounding "no."

    i.    *MATERIALITY*

      There is no evidence in this case that any reasonable investor considered a representation about a specific window of delivery for his or her precious metals material. A representation or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment. *Commodity Futures Trading Comm'n. v. Next Fin. Servs. Unlimited*, No. 04-80562-CIVRYS, 2006 WL 889421, at *4 (S.D. Fla. Mar. 30, 2006) (citing *R.J. Fitzgerald,* 310 F.3d at 1328-29 (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) & *R & W Tech. Serv., Ltd. v. CFTC,* 205 F.3d 165, 170 (5th Cir.2000) ("[B]ecause extravagant claims understate the inherent risks in commodities trading, a reasonable investor would find [such] fraudulent misrepresentation to be material").

      Material representations in commodities fraud cases typically involve blatant misappropriation of customer funds, or solicitations that include wildly inflated claims of profit, or promises of little or no risk. *E.g., U.S. Commodity Futures Trading Comm'n v. Machado*, 11-22275-CIV, 2012 WL 2994396 at *6 (S.D. Fla. Apr. 20, 2012) (guarantees of monthly profits and assurances of limited risk); *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC,* 21 F. Supp. 2d 1317, 1331 (S.D. Fla. May 16, 2014) (failure to disclose that no metals were ever purchased); *R.J. Fitzgerald,* 310 F.3d at 1328-29 (promises that 200-300% profits were expected to continue).   Nothing of the sort is alleged, much less supported by evidence, in this case. The single representation that forms the basis for Count III is contained in

---

[3] Corporate Monitor's Report of Conclusions and Recommendations [DE 75] dated March 10, 2014 ("Monitor's First Report") at 2.

section 4.1 of the Account Agreements: "[y]our transactions with Worth involve delivery within at most 28 days of the date of purchase. . . . As a result they are not regulated by the Commodity Futures Trading Commission or the National Futures Association." Worth-Retailer Account Agreement, [D.E 43-2] at 2, attached hereto at Exhibit 14  There is no evidence in this case that a reasonable purchaser of metals from Worth would consider this representation material or ever considered it at all in deciding to make a purchase.

The 28 day delivery requirement put in place by Dodd-Frank was intended to resolve a long standing *jurisdictional* issue about what is a 'future' and what is simply a 'sale' of a commodity. SOF ¶ 3; *CFTC v. Zelener*, 373 F.3d 861, 866 (7th Cir. 2004).[4] Now, assuming certain other requirements are met, financed commodity transactions that result in "actual delivery" in greater than 28 days are treated like "futures," and therefore, subject to the jurisdiction of the CFTC which implicates a host of other requirements, including that they be traded on a regulated exchange by registered commodity brokers. *See* 7 U.S.C. § 2(c)(2)(D)(ii); Compl. ¶¶ 100-107 (Count II), 117-123 (Count IV). Significantly, however, there is no material distinction from a retail customer's perspective between a retail commodity transaction in which the commodity is delivered in 28 days or less, and one that is delivered in 29, 30 or 50 days, so long as it is delivered.  The only difference is in the regulatory requirements imposed on the seller. *See, e.g.,* 7 U.S.C. § 2(c)(2)(D)(ii); Compl. ¶¶ 100-107 (Count II), 117-123 (Count IV). While a retail customer might care, in the abstract, whether his or her transaction is exchange-traded, there is no evidence that any customer traded or refused to trade with Worth on that basis.

There is no evidence that the 28-day delivery deadline was put in place as a guideline to judge the risks inherent in a commodity transaction and there is no evidence in this case that customers who did not receive delivery of their metal within 28 days were exposed to any greater counterparty risk. Exhibit 27, Quinn Report, at 19-20. The CFTC's own expert in this case could not even quantify the differing counterparty risk between a regulated and unregulated trade.

---

[4] *See also, e.g.,* Plaintiff's Response in Opposition to the Motion to Dismiss, [D.E. 48] at 15-16 n.15 ("[The] contracts [in Zelener] function just like futures contracts, but the court of appeals, . . . based on the wording of the contract documents, held them to be spot contracts outside of CFTC jurisdiction. The CFTC Reauthorization Act of 2008, which was enacted as part of that year's Farm Bill, clarified that such transactions in foreign currency are subject to CFTC anti-fraud authority. It left open the possibility, however, that such Zelener- type contracts could still escape CFTC jurisdiction if used for other commodities such as energy and metals. Section 742 corrects this by extending the Farm Bill's "Zelener fraud fix" to retail off exchange transactions in all commodities. (quoting 156 Cong. Rec. S5924 (daily ed. July 15, 2010)) ("The legislation specifically outlines the functional elements of the transactions now under CFTC jurisdiction and makes the parties' attempts to characterize them as commodity futures, forwards, or spot contracts irrelevant.").

Exhibit 31, Deposition of Daniel Driscoll at 29-32. Aside from conclusory statements about perceived counterparty risk, there is simply no evidence in this case to suggest that transactions resulting in delivery shortly after 28 days pose any greater risk than those resulting in delivery within 28 days.

Delivery delays are similarly immaterial to a customer's ability to make a profit. During the relevant period, the moment an account was opened, customers were fully able to trade on the metal in their account, regardless of whether any metal had been delivered to a depository. Exhibit 21, Russo Dec. at ¶ 9. As such, they could immediately take advantage of any gains in the market and liquidate their positions whether or not physical metal was in place at a depository. Exhibit 21, Russo Dec. at ¶ 9.[5] There is no evidence that any customer was harmed in any way by a delayed delivery of metal. SOF ¶ 24.

The complete lack of evidence to suggest that any customer lost money or was exposed to any additional risk as a result of a delivery delay is fatal to the materiality element of the fraud claim alleged in Count III.

ii.    SCIENTER

The CFTC also lacks any evidence that any even arguable misrepresentations regarding the timing of delivery were made with scienter. The undisputed material evidence in this case demonstrates that the Worth Parties acted in a good faith effort to comply with Dodd-Frank by implementing practices and procedures designed to ensure compliance with its delivery obligations and that they, in fact, accomplished timely delivery in the vast majority of transactions. SOF ¶ 22.

To establish that the Worth Parties acted with scienter, the CFTC must show that: (1) the Worth Parties knew their misrepresentations were false and calculated to cause harm; or (2) that the subject conduct involves "highly unreasonable omissions or misrepresentations . . . that present a danger of misleading [customers] which is either known to the [d]efendant or so obvious that [d]efendant must have been aware of it." *CFTC v. R.J. Fitzgerald,* 310 F.3d 1321, 1327–28 (11th Cir.2002); *CFTC v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 774 (9th Cir.1995). *See also U.S. Commodity Futures Trading Comm'n v. Machado,* No. 11-22275-CIV, 2012 WL 2994396, at *5 (S.D. Fla. Apr. 20, 2012) (citing *Do v. Lind–Waldock & Co.* [1994–1996

---

[5] Worth began the process of effectuating the actual delivery precious metals immediately upon receipt of customer funds and, after the CFTC's initial interpretation in December 2011, clarified the issue, delivered the full amount of purchased metal regardless of any offsetting sales. Exhibit 21, Russo Dec. at ¶ 8.

Transfer Binder] Comm. Fut. L. Rep. (CCH) 25,516 at 43,321 (CFTC Sept. 27, 1995) (determining that a reckless act is one where there is so little care that it is "difficult to believe the [actor] was not aware of what he was doing"). Courts have noted in analogous SEC Rule 10b-5 cases that "[t]he fact that a future prediction turns out to be wrong does not mean it was fraudulent when made." *Mathews v. Centex Telemanagement, Inc.,* No. C-92-1837-CAL, 1994 WL 269734, at *6 (N.D. Cal. June 8, 1994) (citing *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 489, 490 (9th Cir.1974)). Accordingly, the CFTC must prove either that the system of allocation and delivery established by the Worth Parties after Dodd-Frank was never intended to accomplish timely delivery, or that it presented a danger of delivery delays which was either known to the Worth Parties, or so obvious that they must have been aware of it. The evidence in this case does not support either conclusion.

The undisputed material facts demonstrate that the Worth Parties went to great lengths to implement a procedure to ensure that metal was timely delivered, and that its system was effective approximately 94.6 percent of the time between July 16, 2011 and December 31, 2012, and 100 percent of the time from January 2013 through the present. SOF ¶¶ 19-25. The Worth Parties hired one of the most experienced attorneys in the field, SOF ¶6, were confident in his ability and followed his advice, SOF ¶7,          Redacted - Under Seal

                                                    SOF ¶ 8. The resulting system of allocation and delivery was designed specifically to delivery and allocate precious metals to the customer's account within 28 days. SOF ¶¶ 19-23. There is absolutely no evidence that the Worth Parties were anything other than completely devoted to creating a compliant delivery and allocation system.

Isolated delivery delays occurred in the months after July 16, 2011, but there is no evidence that any of them were attributable to any error or omission of the Worth Parties, let alone intended or orchestrated by the Worth Parties in any manner which would, if proved, support a fraud claim. In September and November 2011, for example, several deliveries were delayed as a result of errors by the shipping company. SOF ¶ 21. In a good faith effort to avoid future delays, Worth began to purchase "[l]iterally, tons of metal" to ensure that its delivery obligations were met. Wilshire Dep. at 246; SOF ¶ 23. These efforts continue even today. The Worth Parties consented to a corporate monitorship, made every aspect of their business open to her review and criticism, agreed to limitations on their pay and personal finances during the

period of her analysis, and, upon her recommendations, negotiated a loan and put in place a new internal accounting system. SOF ¶ 25.

Summary judgment is appropriate where there is, as here, substantial evidence of good faith and nothing but speculative inferences of scienter. *See In re Fed. Nat. Mortgage Ass'n Sec., Derivative & ERISA Litig.,* 905 F. Supp. 2d 63, 71 (D.D.C. 2012) (citing *Howard v. SEC,* 376 F.3d 1136, 1147 (D.C.Cir. 2004); *In re Digi Int'l Sec. Litig.,* 14 F. App'x 714, 717 (8th Cir.2001). In this case, the evidence supports only one reasonable conclusion, that the Worth Parties implemented a system in a good faith effort to comply with Dodd-Frank and maintained that system to the best of their ability despite logistical delays outside of their control. Summary Judgment should be granted in favor of the Worth Parties on Count III.

**B. The Worth Parties did not Commit Fraud with Respect to Fully Paid Customers**

Count I of the Complaint is based on an alleged misrepresentation made to fully-paid customers in the Account Agreements drafted by Giovannone. Those agreements failed to clarify that Worth covered fully-paid customer obligations with unallocated, spot-deferred positions at reputable bullion merchants (as opposed to allocated accounts with specifically designated bullion). SOF ¶¶ 9-10. Prior to Dodd-Frank, Worth covered all customer obligations with unallocated positions and clearly disclosed that fact in the Account Agreements. SOF ¶¶ 9-10. That practice was legal then and is legal now, even under Dodd-Frank. Even though Giovannone was aware of Worth's past practice and intended future practice of continuing to cover fully paid transactions with unallocated positions, he failed to include such a disclosure in the Account Agreement, but instructed Worth to use these Account Agreements for all transactions. The Worth Parties relied this advice.

Good faith reliance on the advice of an accountant or an attorney is a viable defense to scienter in securities and commodities fraud cases. *See U.S. Commodity Futures Trading Comm'n v. McCrudden*, No. 10 CV 5567 DRH AKT, 2013 WL 142377, at *5 (E.D.N.Y. Jan. 11, 2013); *Howard v. SEC,* 376 F.3d 1136, 1147-50 (D.C. Cir. 2004); *Newton v. Uniwest Fin. Corp.,* 802 F. Supp. 361, 367–68 (D. Nev. 1990), *aff'd,* 967 F.2d 340 (9th Cir. 1992) (granting summary judgment for defendant because, *inter alia,* plaintiff had not produced evidence to counter defense of good faith reliance on accountant); *Mathews v. Centex Telemgmt., Inc.,* No. C–92–1837, 1994 WL 269734, at *7 (N.D. Cal. June 8, 1994) (granting summary judgment for defendants because, in part, "[d]efendants also conferred with and relied in good faith on their

9

outside auditor"). To establish the defense, the Worth Parties must show that they made a complete disclosure, sought advice as to the appropriateness of the challenged conduct, received advice that the conduct was appropriate, and relied on that advice in good faith. *See Newton,* 802 F. Supp. at 367–68.

Here, the Worth Parties have demonstrated each of the elements of their advice of counsel defense. Every witness with knowledge of the pre-Dodd-Frank communications between the Worth Parties and Giovannone testified that Giovannone was fully aware of Worth's practice of covering customer obligations with unallocated, spot deferred positions. SOF ¶ 9-10. Mr. Wilshire testified that he specifically requested that Giovannone assist Worth in becoming compliant with all regulations that impacted his business and specifically that he draft new agreements and assist in implementing a new procedure to comply with the delivery obligations in Dodd-Frank. SOF ¶ 7. There is substantial evidence of the Worth Parties' good faith efforts to be completely compliant with Dodd-Frank. SOF ¶¶ 6-10, 19-25. With knowledge of Worth's business, a clear directive on complete compliance with Dodd-Frank, Giovannone informed the Worth Parties that Dodd-Frank did not apply to fully-paid transactions, and that as such, their business practices with respect to those customers did not need to change. SOF ¶ 9-11. Despite this advice, he drafted new Account Agreements failing to disclose this practice to fully-paid customers and advised the Worth Parties to use these Agreements for all transactions. SOF ¶¶ 11-14. As soon as Giovannone became aware of this error, he advised the Worth Parties to deliver metal for all fully-paid customers, and he prepared an amended version of the Account Agreements that contained the specific disclosure that he failed to include in the original post-Dodd-Frank Agreements. SOF ¶¶ 16-18.

Finally, there is substantial evidence that the Worth Parties relied on Giovannone's advice in good faith. Throughout the emails and testimony produced in discovery, the Worth Parties trusted in Giovannone's ability. SOF ¶¶ 6-9. They developed a system of delivery and allocation based on his advice, used his account agreements, and trusted him to completely restructure their business in light of the complex new regulations. SOF ¶¶ 7-8, 15, 19-21. The moment the error was discovered they quickly corrected it. SOF ¶¶ 16-17. Indeed, throughout this case, the Worth Parties have repeatedly demonstrated their good faith efforts to come into complete compliance with all applicable regulations.

Although scienter is generally a question of fact for a jury, summary judgment is appropriate here because the CFTC can present no evidence of scienter. *In re Fed. Nat. Mortgage Ass'n Sec., Derivative & ERISA Litig.,* 905 F. Supp. 2d 63, 71 (D.D.C. 2012) (citations omitted); *see also In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1425 (9th Cir.1994) (finding defendants had "conclusively rebutted" plaintiffs' "speculative inferences" of fraud). Indeed, substantial evidence of good faith can negate any speculative inference of scienter. *In re Fed. Nat. Mortgage Ass'n Sec., Derivative & ERISA Litig.,* 905 F. Supp. 2d 63, 71 (D.D.C. 2012) (citing *Howard v. SEC,* 376 F.3d 1136, 1147 (D.C. Cir. 2004). A scienter allegation simply does not make sense in light of the facts as they have been exposed by discovery:  having disclosed its use of cash forward prior to Dodd Frank, Worth had no reason to hide it once the law went into effect, and no reason to have corrected the omission unless it was a mistake. Furthermore, if a party's lawyer is advising that particular transactions are exempt from a law, there is no reason for a client to think that the contract he drafted for "all transactions" presented any type of exposure in respect of those exempt transactions.  Summary judgment should be granted in favor of the Worth Parties on Count I.

### IV.    There is No Issue of Material Fact on Counts Two and Four as the CFTC has Presented No Credible, Admissible Evidence on the Number of Late Transactions

There is no issue of material fact as to Counts Two and Four, both of which are predicated upon the number of transactions in which Worth allegedly allocated metal outside of the 28 day rule.  **Worth admits it allocated metal outside of applicable period in 326 transactions** (less than 5% of all transactions), never purposefully.  *See* Evans Report, ¶ 19  And the only analysis the CFTC has submitted is so badly flawed and so outside the bounds of an appropriate summary exhibit that it must be excluded. *See* Worth's Parties' Motion to Exclude Melissa Glasbrenner's Summary Exhibit and Other Analysis Relying on the Same Process and Methodology ("Motion to Exclude"), [D.E. 145].

Therefore the Court must find, and the jury would be directed to find, that Worth allocated metal outside of the 28 day rule on 326 occasions and no more.

### A. Using a Consistent and Verifiable methodology, the Evans Summary Exhibit Shows 326 Late Deliveries

The Evans Summary Exhibit is an admissible "summary, chart or calculation" which "prove[s] the content of voluminous" data as required by Federal Rule of Evidence 1006.  The Evans Summary Exhibit uses data from the same source containing the same source-code which

allows the pairing process between customer transaction and allocation request to be automated and verifiable. *See* Evans Dep. at 169:22-170:16. In instances where a customer transaction did not match with an allocation request within Worth's SQL database, NERA reviewed additional records, to find either a corresponding allocation request, a voided transaction, and offsetting sale, or an internal account indication and *documented* this process such that it could be independently verified. *See* Evans Dep. at 173:20-175:06. As such, the Evans Summary Report is a proper summary calculation under Rule 1006 and can be admitted into evidence and considered by this Court in Summary Judgment. *See* Fed. R. Evidence 1006.

Under this consistent and verifiable methodology, Evans found that during the relevant time period there were 326 late deliveries.

### B. The Glasbrenner Summary Exhibit is Inaccurate and Unreliable and Must be Excluded as Inadmissible

"In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form." *Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001); *Pritchard v. Southern Co. Servs*., 92 F.3d 1130, 1135 (11th Cir. 1996). *See also, Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1255 (11th Cir. 2010) (upholding district court decision to exclude unreliable evidence and granting summary judgment because without that evidence there was no issue of material fact); *Jack v. Glaxo Wellcome, Inc*., 239 F. Supp. 2d 1308, 1317 (N.D. Ga. 2002) (granting summary judgment where the court found that "the methodology employed [was] unreliable and, therefore, inadmissible.").

As set out in the Motion to Exclude, the Glasbrenner Summary Exhibit would be so misleading to the trier of fact that it cannot be received into evidence in this case and thus cannot be considered by the Court here. *See Matter of Brackin*, 148 B.R. 953, 957 (Bankr. N.D. Ala. 1992) (The proponent of a summary pursuant to Rule 1006 must establish "that the summarized material is … accurate.") citing *Wright v. Southwest Bank*, 554 F.2d 661 (5th Cir. 1977) and *Needham v. White Laboratories, Inc*., 639 F.2d 394, 403 (7th Cir. 1982). *See also, US v. Modena* ("requirements for the admission of an evidentiary summary" include that "the summary must be accurate").

Indeed, as described in the Motion to Exclude, the Glasbrenner Summary Exhibit is so methodologically flawed and inaccurate that it is inadmissible under Rule 1006 as a matter of law. Ms. Glasbrenner's process of manually applying (or not applying) individual formulas to 27,000 lines of data based on the manual groupings of customer transactions and allocations is so

12

unreliable, prone to inaccuracy and unverifiable, that it cannot be relied upon to give an accurate count of the number of transactions that the CFTC deems tardily allocated. *See* Motion to Exclude at 15.

And beyond the pervasive—and incurable—inaccuracies in the Glasbrenner Summary Exhibit due to its reliance on the manual processes, the first in first out ("FIFO") methodology Ms. Glasbrenner employs further inflates the number of late transactions; instead of matching obvious corresponding customer transactions and allocations, the FIFO methodology assumes that the earliest purchase of a particular type of metal must be allocated before any subsequent purchase of the same type of metal can be allocated. *See* Motion to Exclude at 12. By blindly sticking to the "first in first out method", Ms. Glasbrenner seemingly intentionally ignores obvious pairings. When these obvious pairs are missed, the number of late transaction is then compounded, such that one late or missed transaction leads to the counting of multiple future transactions as late. *See* Motion to Exclude at 12.

For all these reasons, and as fully set out in the Motion to Exclude, the Glasbrenner Summary Exhibit should be excluded as inadmissible Rule 1006 summary evidence. There is thus no issue of material fact as to the number of late transactions under Count Two or Count Four: The Court should find that Worth was late in its deliveries on 326 occasions as set out in the Evans Summary Exhibit and the parties should continue to the penalty phase on these counts.

<u>**CONCLUSION**</u>

After more than four years since it began its investigation into the Worth Parties, the CFTC has no evidence that they committed fraud and no reliable estimate of Worth's late deliveries. The undisputed material evidence in this case demonstrates that the Worth Parties went to great lengths in their good faith efforts to comply with a complicated new statute. They structured their business based on the advice of an experienced commodities attorney, promptly corrected any errors brought to their attention, agreed to a corporate monitorship, and have undertaken an expensive analysis to determine the precise number of late transactions at issue in this case. There is no evidence, however, that any customer was harmed as a result of those violations and hence, no basis upon which calculate or impose any civil penalties against the Worth Parties. Based on the actual evidence, no reasonable jury can find in favor of the CFTC on any of its claims. The Court should enter judgment in favor of the Worth Parties on all Counts.

Respectfully submitted,

April 24, 2015

By: /s  Edward A. Marod
Edward A. Marod, Esq.
Florida Bar No. 238961
Email:  emarod@gunster.com
G. Joseph Curley, Esq.
Florida Bar No. 571873
Email: gcurley@gunster.com
Nathan W. Hill, Esq.
Florida Bar No. 091473
Email: nhill@gunster.com
*Attorneys for Defendants Worth Group, Inc.,*
*Andrew Wilshire, and Eugenia Mildner*
**GUNSTER, YOAKLEY & STEWART,
P.A**.
777 South Flagler Drive
Suite 500 East
West Palm Beach, Florida  33401-6194
Telephone:     (561) 655-1980
Facsimile:      (561) 655-5677

By: /s Matthew I. Menchel
Matthew I. Menchel, Esq.
Florida Bar No. 012043
Email: matthew.menchel@kobrekim.com
John D. Couriel, Esq.
Florida Bar No. 0831271
Email:  john.couriel@kobrekim.com
*Attorneys for Defendants Andrew Wilshire and*
*Eugenia Mildner*
**KOBRE & KIM LLP**
2 South Biscayne Boulevard
35th Floor
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile:  (305) 967-6120

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 24, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. I further certify that the foregoing document is being served on all counsel of record identified on the list below via transmission of Notices of Electronic Filing generated by CM/ECF:

| | |
|---|---|
| Rosemary Hollinger<br>U.S. Commodity Futures Trading Commission<br>525. W Monroe Street<br>Suite 1100<br>Chicago, IL 60661<br>Tel: (312) 596-0700<br>Fax: (312) 596-0714<br>Email: rhollinger@cftc.gov | Elizabeth N. Pendleton<br>U.S. Commodity Futures Trading Commission<br>525 West Monroe Street<br>Suite 1100<br>Chicago, IL 60661<br>Tel: (312) 596-0629<br>Fax: (312) 596-0714<br>Email: ependleton@cftc.gov |
| David Chu<br>U.S. Commodity Futures Trading Commission<br>525 West Monroe Street<br>Suite 1100<br>Chicago, IL 60661<br>Tel: (312) 596-0642<br>Fax: (312) 596-0714<br>Email: dchu@cftc.gov | Brigitte Weyls<br>U.S. Commodity Futures Trading Commission<br>525 W. Monroe Street<br>Suite 1100<br>Chicago, IL 60661<br>Tel: (312) 596-0547<br>Fax: (312) 596-0714<br>Email: bweyls@cftc.gov |

/s/Edward A. Marod
**Edward A. Marod, Esq.**